UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

KYLE B. RICHARDS et al.,

              Plaintiffs,            Case No. 2:20-cv-194

v.                                Honorable Paul L. Maloney

HEIDI WASHINGTON et al.,

              Defendants.

_____/

**OPINION**

        This is a civil rights action brought by three state prisoners under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, the Court will deny class certification and will dismiss, for failure to state a claim, Defendants Washington, Gasper, and Rajala, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court also will dismiss, for failure to state a claim, the following claims against the remaining Defendants:  Plaintiffs' PREA and international law claims; their First, Eighth, and Fourteenth Amendment claims related to the prohibition on hard-core pornography and other explicit content; their due process claims; and the claim alleging religious discrimination

and denial of equal protection based on the banning of Dungeons and Dragons.  In addition, the Court will dismiss, for failure to state a claim, Plaintiffs' retaliation claim against Defendant Perttu. Further, the Court will deny Plaintiff Richards' pending motions (ECF Nos. 5, 15-19).  Plaintiffs' Eighth Amendment claims against Defendant Perttu for excessive force and sexual assault and their Eighth Amendment claims against Defendants Neimi and Taskila for denial of medical care remain in the case.

## Discussion

### I.      Factual Allegations

Plaintiffs Kyle B. Richards, Robert Kissee, and Kenneth Damon Pruitt presently are incarcerated with the Michigan Department of Corrections (MDOC) at the Baraga Correctional Facility (AMF) in Baraga, Baraga County, Michigan.  The events about which they complain occurred at that facility.  Plaintiffs sue MDOC Director Heidi Washington and the following AMF officials:  Warden Kristopher Taskila; and Residential Unit Managers Unknown Perttu and Unknown Neimi.  Plaintiffs also sue Michigan State Police (MSP) Director Joseph M. Gasper and Sergeant Thomas Rajala.

Plaintiffs seek to pursue a class action.  In the first count of their complaint, they allege that, on April 16, 2020, Defendant Perttu approached Plaintiff Richards' door and informed him that he would be calling him out to talk, because Plaintiff needed to do what he was told.  An hour later, Plaintiffs Richards and Pruitt were escorted to the 3-Unit phone room, where Defendant Perttu punched and beat them and then demanded oral sex.  Defendant Perttu shoved his penis into Plaintiff Richards' mouth and engaged in penetration for 30 minutes.  Perttu then punched Plaintiff Pruitt and orally raped him.  Plaintiffs were handcuffed throughout.

On April 24, 2020, all three Plaintiffs were called down to the Unit-3 conference room and locked into the phone room with Defendant Perttu.  They were again in handcuffs.  Perrtu

2

attacked Plaintiff Richards, tearing off his clothing.   Perttu then fondled Richards' genitals, complaining that Richards was not erect.   Plaintiff Richards told Perttu that he was afraid and wanted to stop.   Defendant Perttu persisted and, after some time, punched Richards, and then began fondling Plaintiff Pruitt.   Pruitt resisted, prompting Perttu to punch him multiple times.   Defendant Perttu then attacked Plaintiff Kissee, threatening to kill him.

On May 20, 2020, the three Plaintiffs were called out a third time.   Defendant Perttu forcefully pushed Plaintiff Richards' head into Perttu's genital area.   Plaintiff Richards bit Perttu's penis.   At that point, Defendant Perttu punched Plaintiff Richards until he passed out.

Plaintiffs were once again called on June 1, 2020.   On that occasion, Plaintiffs were stripped naked and beaten bloody.

Defendant Perttu approached Plaintiffs' door on June 29, 2020, threatening to call Plaintiffs out again very soon and warning them to be ready.   Plaintiffs fear future assaults.

Plaintiffs allege Defendant Perttu's conduct violated the Prison Rape Elimination Act (PREA), 34 U.S.C. § 30301, the Eighth Amendment, and the Fourteenth Amendment, as well as the Universal Declaration of Human Rights and the International Convention against Inhumane Treatment and Torture.

In Count 2 of their complaint, Plaintiffs allege that they sent multiple kites about the incidents to Defendants Washington, Taskila, Rajala, and Gasper, but those Defendants took no action.   During rounds on April 23, 2020, between the date of the first and second incidents with Perttu, Plaintiffs spoke to Defendant Taskila, asking what was going to be done.   Taskila responded, "Nothing."   (Compl., ECF No. 1, PageID.6.)   Before walking off, Defendant Taskila stated, "Well you guys have been down long enough to know how we do things around here. Generally we protect our own."   (*Id.*)

3

On May 15, 2020, between the second and third incidents, Plaintiffs allegedly spoke to Defendant Washington, informing her about the ongoing incidents of sexual abuse.  Washington allegedly stated, "We[']re aware of what's going on there.  I'm not going to let this damage the reputation of my facility."  (*Id.*)

Plaintiff Richards also allegedly met with Defendant MSP Sergeant Rajala on May 4, 2020, when Rajala came to interview Plaintiff over an unrelated matter concerning a terror threat against the courts.  Plaintiff Richards explained what was going on, and Defendant Rajala acknowledged receiving Plaintiff's letters and indicated that a copy had been forwarded to Defendant Gasper and another copy to MDOC internal affairs.  Rajala indicated that the MSP did not get involved unless the MDOC requested assistance.  Plaintiffs contend that Defendant Rajala's response indicated that the MSP has a "hands off" policy that violates the PREA, the Eighth and Fourteenth Amendments and the Universal Declaration of Human Rights and the International Convention against Inhumane Treatment and Torture.

In Count 3 of the complaint, Plaintiffs allege that, on April 16, 2020, and May 20, 2020, Defendants Neimi and Taskila ignored requests from Plaintiffs Richards, Pruitt, and Kissee for medical attention.  On April 16, Defendant Neimi instructed medical staff not to provide medical assistance.  During rounds, Defendant Taskila told all three Plaintiffs that they should drop the issue and that no medical services would be allowed, despite the fact that two Plaintiffs had apparent and significant injuries:  Plaintiff Richards suffered a battered face, broken nose, and sprained arm; and Plaintiff Pruitt incurred a sprained wrist, sprained neck, bruising to his ribs and face, and internal bleeding.  On May 20, Plaintiffs Pruitt and Kissee again stopped Defendant Taskila during rounds, requesting emergency medical treatment.  Again, Taskila told Plaintiffs to drop the issue and ignored the request for medical care.  Plaintiff Pruitt had internal bleeding,

severe lacerations to his face and chest, and bruising across his body.  Plaintiff Kissee was coughing up blood.  Plaintiffs allege that they filed multiple health care requests but received no treatment.  Plaintiffs contend that Defendants Neimi and Taskila denied them necessary medical care, in violation of the Eighth and Fourteenth Amendments and unspecified international treaties, presumably the Universal Declaration of Human Rights and the International Convention against Inhumane Treatment and Torture.  They allege that unnamed medical personnel also denied them medical attention.

In Count 4 of the complaint, Plaintiffs allege that Defendant Perttu retaliated against them for filing grievances and interfered with their grievances, ostensibly in violation of the First, Eighth, and Fourteenth Amendments and international law.  Plaintiff Richards allegedly submitted three grievances against Defendant Perttu on May 4, 2020, but Defendant Perttu subsequently came to Plaintiff's door and tore up all three grievances.  Plaintiff Richards submitted two additional grievances against Defendant Perttu directly to Defendant Neimi on May 6, but the grievance coordinator reported on May 13 that he had never received grievances from Plaintiff. On May 20, Defendant Perttu came to Plaintiff Richards' door and threatened to kill Plaintiff if he filed more grievances.  Plaintiff, however, continued to file grievances.  On May 25, Defendant Perttu called Plaintiff to the phone room, where he punched Plaintiff in the face and ripped up his grievances.

Plaintiff Pruitt submitted four grievances on May 4, 2020, but Defendant Perttu came to his door on May 5 and tore them up.  On May 6, Pruitt allegedly submitted more than a dozen grievances directly to the Assistant Resident Unit Supervisor.  A few days later, however, Pruitt received a memo from the grievance coordinator, indicating that he had received no grievances from Pruitt.  On May 20, Defendant Perrtu picked up several grievances from Pruitt on

morning rounds.  Perttu then crumbled them up and threw them in the trash.  On May 25, Defendant Perrtu warned Plaintiff Pruitt that, if he kept it up, something might happen to him.

Plaintiff Kissee had a similar experience.  On May 4, 2020, Plaintiff Kissee placed several grievances in his door for submission, but Defendant Perttu took them from the door and tore them up.  Plaintiff Kissee placed five additional grievances in a manila envelope and submitted them to the ARUS for transmission to the grievance coordinator.  The grievance coordinator told Kissee later that day that he never received any grievances.  On May 20, Defendant Perttu came to Plaintiff Kissee's door with four grievances, crumpled them up, and told Kissee they were going in the trash.  On June 23, Perttu came to Pruitt's door holding four grievances.  Perttu told Pruitt, "I'm doing you a favor and put these in the garbage.  If I see these again you'll be in a world of hurt."  (*Id.* at 11.)

Plaintiffs' fifth claim for relief is that Defendants Washington, Taskila, and Perttu have caused them "'psychosomatic' stress and physical harm" by maintaining a policy of not providing them "equal access to sexually stimulating materials necessary for maintaining psychological health."  Plaintiffs contend that the prison does not permit hard-core pornography and, while it permits the possession of soft porn, including nude pictures, such materials are expensive and not available to prisoners without substantial resources.  Plaintiffs allege that sexual stimulation is a basic human need like food and water and that its absence causes physical ailments.  They allege that Defendants' failure to provide sexually stimulating materials violates the Eighth and Fourteenth Amendments, international law, and the PREA.

In Claim 6, Plaintiffs allege that the limitations on sexually stimulating materials are unreasonably restrictive and deprive them of their right to equal protection under the Fourteenth Amendment.  Plaintiffs also contend that the restrictions place them at increased risk of prison

rape due to sexual frustrations among the prison population, in violation of the PREA, the Eighth Amendment, and international law.

Plaintiffs allege in Claim 7 that Defendants' policy governing sexually explicit materials amounts to censorship, lacks a legitimate penological purpose, and is counterproductive, in violation of the First, Fifth, and Fourteenth Amendments and international law.  Plaintiffs contend that, if providing sexually explicit mail is not reasonably feasible, Defendants should provide access to an "adult television station."  (*Id.*, PageID.17.)

In their final claim, Claim 8, Plaintiffs allege that MDOC Policy Directive 04.07.112, Attach. A-21, B-27, and C-34, violates the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1, by prohibiting the game "Dungeons and Dragons."  Plaintiffs allege that the prohibition demeans the religions of Wicca and Druidry, because the game is premised on Wiccan lore and liturgy, which itself depends on the Greek, Roman, and Chinese mythological pantheon.  Plaintiffs contend that Defendants favor Christian religions by permitting Christian observants to possess Christian board games, Bible flashcards, and Bible puzzles.

Plaintiffs seek declaratory and injunctive relief, together with nominal, compensatory, and punitive damages.

## II.    Class Certification

Plaintiffs seek class certification.  They contend that there are thousands of victims in the MDOC system who have suffered verbal, physical, or sexual abuse by one or more MDOC employees, as well as deprivations of personal property.  They also contend that numerous prisoners suffer from the deprivation of sexually explicit materials, which causes extreme mental suffering.

The purposes of class-action suits are judicial economy and the opportunity to bring claims that would not be brought absent the class action, because it might not be economically feasible to bring them as individual claims.  *See Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 650 (6th Cir. 2006).  Federal Rule of Civil Procedure 23, which governs class certification, provides that:

> One or more members of a class may sue . . . as representative parties on behalf of all only if (1) the class is so numerous that joinder . . . is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P.  23(a).  The four prerequisites for class certification are respectively referred to as "numerosity, commonality, typicality, and adequacy of representation."  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010); *see also*, *Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006); *Reeb*, 435 F.3d at 645; *Golden v. City of Columbus*, 404 F.3d 950, 965 (6th Cir. 2005); *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002). If the requirements of Rule 23(a) are met, the person seeking class certification must also establish that the case satisfies one of the three types of class actions set forth in Rule 23(b).  *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003).  The first type of case maintainable as a class action is one in which separate actions by individual class members would risk establishing "incompatible standards of conduct for the party opposing the class," or would "be dispositive of the interests" of nonparty class members.  Fed. R. Civ. P.  23(b)(1)(A) and (B).  The second type of class action requires that the plaintiffs primarily seek injunctive or declaratory relief.  Fed. R. Civ. P. 23(b)(2). The third type of class action requires that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); *see also Alkire*, 330 F.3d at 820.

Plaintiffs bear the burden of establishing the right to class certification.  *See In re Am. Med. Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996).  A federal court's discretion in deciding whether to certify a class must be exercised within the framework of Rule 23.  *Id.* at 1079 (citations omitted).  Before certifying a class, the court must conduct a "rigorous analysis" of whether Rule 23 prerequisites are met.  *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982).  In making its analysis, the court may not consider the merits of the case, *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974), but must accept the allegations of the complaint as true and resolve doubts in favor of the plaintiffs.  *See Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1029 (6th Cir. 1977).  The court may draw reasonable inferences from the facts before it.  *See Senter v. Gen. Motors Corp.*, 532 F.2d 511, 520 (6th Cir. 1976).

Plaintiffs' request for class certification fails on multiple prongs of the Rule 23(a) test.  Plaintiffs utterly fail to demonstrate numerosity.  They allege only that Defendant Perttu engaged in misconduct against them—not in similar misconduct against other prisoners at AMF, much less that Defendant Perttu a large number of other similarly situated prisoners at the facility, who would be unable to bring separate actions.

In addition, while they seek to broadly describe the class as one that includes all prisoners who have suffered abuse at the hands of any MDOC employee, allowing such a class would violate other prongs of the test.  The commonality and typicality requirements "tend to merge," and together "serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class members are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998).  Not every common question will suffice to satisfy the commonality requirement because, "at a sufficiently abstract

9

level of generalization, almost any set of claims . . . could display commonality." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1988).  The test is whether there is "a common issue the resolution of which will advance the litigation." *Id.*  The typicality requirement is met only if the plaintiffs' claims arise from the same event, practice or course of conduct that gives rise to the claims of the other class members. *See Little Caesar Enter., Inc. v. Smith*, 172 F.R.D. 236, 242–43 (E.D. Mich. 1997).  It is not met where a "named plaintiff who proved his own claim would not necessarily have proved anybody else's claim."  *Bacon v. Honda of Am. Mfg.*, 205 F.R.D. 466, 481 (S.D. Ohio 2001).

Here, Plaintiffs allege a particular kind of abuse by a single officer.  No basis exists for extending the class to others who may have been abused in other ways by other officials.  In addition, favorable resolution of Plaintiffs' claims against Defendant Perttu would not prove any other prisoner's claim of physical and sexual abuse.  Plaintiffs therefore cannot demonstrate either typicality or commonality with their proposed class.

Moreover, it is well established that *pro se* litigants are inappropriate representatives of the interests of others. *See Garrison v. Mich. Dep't of Corr.*, 333 F. App'x 914, 919 (6th Cir. 2009) (citing *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975)); *see also Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008); *Ziegler v. Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003); *Palasty v. Hawk*, 15 F. App'x 197, 200 (6th Cir. 2001); *Howard v. Dougan*, No. 99-2232, 2000 WL 876770, at *1 (6th Cir. June 23, 2000).  Because Plaintiffs are incarcerated *pro se* litigants, the Court finds that they are not appropriate representatives of a class, much less the class they seek to describe.

Finally, to the extent that Plaintiffs seek declaratory and injunctive relief respecting prison policy governing pornography, the claim is tangential to the central issues in Plaintiffs'

complaint, which have to do with specific conduct.  Moreover, as discussed elsewhere in this opinion, the claim is frivolous and will be dismissed.  Therefore, the Court will deny Plaintiffs' request for class certification.

## III.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed

11

by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## IV.    International Agreements

In each of their eight claims, Plaintiffs allege that Defendants' actions in committing or allowing the assaults, depriving Plaintiffs of sexually stimulating materials, and refusing to allow the playing of Dungeons and Dragons violated the Universal Declaration of Human Rights (UDHR) and the Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[1] [2] The Supreme Court "has long recognized the distinction between treaties that automatically have effect as domestic law, and those that—while they constitute international law commitments—do not by themselves function as binding federal law." *Medellin v. Texas*, 552 U.S. 491, 505 (2008).  Enforcement of the provisions of international agreements must either be self-executing or pursuant to legislation enacted "'to carry them into effect.'"  *Id.* (quoting *Whitney v. Robertson*, 124 U.S. 190, 194 (1888)).

Federal courts do not recognize a private cause of action for prisoners based on the UDHR.  *See Sosa v. Alvarez–Machain*, 542 U.S. 692, 734–35 (2004) (indicating that the UDHR is aspirational only and "does not of its own force impose obligations as a matter of international

---

[1] Plaintiffs refer to the "International Convention Against Inhumane Treatment and Torture."  The Court presumes that Plaintiffs intend to refer to the Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment (CAT).  *See Richards v. Whitmer*, No. 2:20-cv-122, 2021 WL 389048, at *8 & n.5 (W.D. Mich. 2021) (rejecting Plaintiff Richards' identical claims).

[2] Plaintiffs do not separately identify the specific international agreements they intend to reference in Claims 3, 4, 6, 7, and 8.  Instead, they state that Defendants' conduct violated "several international treaty agreements." (Compl., ECF No. 1, PageID.8, 9, 14, 16, 18.)  The Court construes Plaintiffs' allegation as invoking the same international treaties that Plaintiffs have referenced in their other claims for relief.

law"); *see also Ruhaak v. Comm'r of Internal Revenue*, 422 F. App'x 530, 532 (7th Cir. 2011) ("And the Universal Declaration of Human Rights is a statement of principles and not a treaty or international agreement imposing legal obligations."); *Serra v. Lappin*, 600 F.3d 1191, 1196–97 & n.5 (9th Cir. 2010) (the Universal Declaration of Human Rights is not a "source of justiciable rights").  Moreover, the Sixth Circuit has held that an individual "has no cause of action under the [CAT] because it is not self-executing."  *Renkel v. United States*, 456 F.3d 640 (6th Cir. 2006); *see also Nasrallah v. Barr*, 140 S. Ct. 1683, 1694–95 (2020) (Thomas, J., dissenting) (describing the history of the adoption and approval of the CAT by the Senate).

As a consequence, Plaintiffs are unable to sustain a claim under either the UDHR or the CAT.[3]

## V.    PREA

In Claims 1 and 2 of the complaint, Plaintiffs allege that Defendant Perttu violated the Prison Rape Elimination Act (PREA), 34 U.S.C. § 30301 *et seq*., by sexually assaulting them and that other Defendants are responsible for allowing those assaults.  In Claims 5 and 6, Plaintiffs allege that the denial of hard-core pornography violates the PREA by creating "dangerous 'psychosocial' conditions and excess sexual frustrations and sexual tensions" that increase the risk of prison rape.

The PREA does not provide Plaintiffs a cause of action entitling them to relief. Plaintiffs "ha[ve] no independent cause of action for any Defendant's failure to comply with the Prison Rape Elimination Act."  *Beeman v. Heyns*, No. 1:16-cv-27, 2016 WL 1316771, at *12 n.4 (W.D. Mich. Apr. 5, 2016) (citing *Montgomery v. Harper*, No. 5:14-CV-P38R, 2014 WL 4104163,

---

[3] Plaintiff Richards has previously been instructed that these international conventions do not provide a private cause of action.  *See Richards v. Whitmer*, 2021 WL 389048, at 9.  He is advised that any further attempts to raise claims under these provisions will result in the rejection of his complaint.

at *2 (W.D. Ky. Aug. 19, 2014) ("Although not addressed in the Sixth Circuit, district courts have found that the PREA does not create a private cause of action which can be brought by an individual plaintiff.")); *see also McCloud v. Prack*, 55 F. Supp. 3d 478, 482 n.2 (W.D.N.Y. 2014) ("'[N]othing in the statute suggests that PREA intended to establish a private cause of action for allegations of prison rape, and every court to address the issue has determined that PREA cannot support such a cause of action by an inmate.'") (quoting *Amaker v. Fischer*, No. 10-CV-0977, 2014 WL 4772202, at *14 (W.D.N.Y. Sept. 24, 2014) (collecting cases)); *Barhite v. Berghuis*, No. 1:14-cv-670, 2014 WL 4627166, at *5 (W.D. Mich. Sept. 15, 2014) ("Plaintiff's request is predicated on the assumption that the PREA provides him a cause of action for Defendants' alleged sexual assaults.  It does not.").  Accordingly, Plaintiffs' claims under the PREA will be dismissed.

## VI.    Due Process

In their fourth claim, Plaintiffs allege that Defendant Perttu tore up their grievances, in violation of the First, Eighth, and Fourteenth Amendments.  Plaintiffs also appear to allege that Defendant Neimi failed to process grievances that were handed to him directly.  The Court presumes that, by invoking the Fourteenth Amendment, Plaintiffs may intend to allege that Defendants denied them due process by interfering with their right to pursue grievances.

Plaintiffs have no due process right to file a prison grievance.  The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569–70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000).  Michigan law does not create a liberty interest in the grievance procedure.  *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907,

14

at *1 (6th Cir. Mar. 28, 1994).  Because Plaintiffs have no liberty interest in the grievance process, the conduct of Defendants Perttu and Neimi did not deprive them of due process.

## VII.    Eighth Amendment

Plaintiffs raise a series of Eighth Amendment claims against Defendants.  First, they allege in Claim 1 that, in a series of incidents beginning on April 20, 2020, Defendant Perttu has beaten and sexually assaulted them and has threatened to continue doing so.[4]  In Claim 2, Plaintiffs allege that Defendants Washington, Taskila, Rajala, Gasper, and Neimi violated the Eighth Amendment when they failed to take action to prevent future assaults after being informed of Defendant Perttu's conduct.  Further, in Claim 3, Plaintiffs contend that Defendants Neimi and Taskila declined to provide them with medical attention after their severe beatings by Defendant Perttu, despite the severe nature of their apparent injuries.  Finally, in Claims 5 through 7, Plaintiffs allege that Defendants Washington, Taskila, and Perttu have violated and continue to violate their rights under the Eighth Amendment, by maintaining a policy of not providing sexually stimulating materials to all prisoners, thereby imposing psychological torture.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain."  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 347; *see also Wilson*

---

[4] Plaintiffs' allegations in the instant case pick up where their allegations in a previously filed case left off.  *See Richards et al. v. Perttu*, No. 2:20-cv-76 (W.D. Mich.) (ECF No. 1) (claiming that Defendant Perttu sexually harassed and demanded sexual favors from the same plaintiffs between June 20, 2019, and April 16, 2020).

15

*v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey*, 832 F.2d at 954.  "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347).  As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

### A.  Defendant Perttu—Physical & Sexual Abuse

Plaintiffs allege that Defendant Perttu, on multiple occasions, beat and kicked them and forced them to engage in sexual conduct.

Not every shove or restraint gives rise to a constitutional violation, *Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986); *see also Hudson*, 503 U.S. at 9 (holding that "[n]ot every push or shove . . . violates a prisoner's constitutional rights") (internal quotations).  An Eighth Amendment claims has an objective component and a subjective component.  *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)).  First, "[t]he subjective component focuses on the state of mind of the prison officials." *Williams*, 631 F.3d at 383.  We ask "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7.  Second, "[t]he objective component requires the pain inflicted to be 'sufficiently serious.'" *Williams*, 631 F.3d at 383 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9 (internal quotations

16

omitted).  The objective component requires a "contextual" investigation, one that is "responsive to 'contemporary standards of decency.'"  *Id.* at 8 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  While the extent of a prisoner's injury may help determine the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).  "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . [w]hether or not significant injury is evident."  *Hudson*, 503 U.S. at 9.  "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."  *Id.*; *see also Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (holding that prison officials violate the Eighth Amendment when their "offending conduct reflects an unnecessary and wanton infliction of pain"); *Bailey v. Golladay*, 421 F. App'x. 579, 582 (6th Cir. 2011).

Applying this standard, the Court concludes that Plaintiffs' allegations concerning Defendant Perttu's repeated physically abusive conduct—punching, kicking, and beating Plaintiffs—clearly are sufficient to state a claim.

Moreover, "because the sexual harassment or abuse of an inmate by a corrections officer can never serve a legitimate penological purpose and may well result in severe physical and psychological harm, such abuse can, in certain circumstances, constitute the 'unnecessary and wanton infliction of pain'" forbidden by the Eighth Amendment.  *Freitas v. Ault*, 109 F.3d 1335, 1338 (8th Cir. 1997) (quoted cases omitted).  "To prevail on a constitutional claim of sexual harassment, an inmate must therefore prove, as an objective matter, that the alleged abuse or harassment caused 'pain' and, as a subjective matter, that the officer in question acted with a sufficiently culpable state of mind."  *Freitas*, 109 F.3d at 1338 (citing *Hudson*, 503 U.S. at 8).

Plaintiff's allegations concerning Defendant Perttu's sexually abusive conduct, if true, are more than sufficient to state a claim.

### B. Defendants Rajala and Gasper—Failure to Investigate & Prosecute

Plaintiffs allege that Defendant MSP officials Rajala and Gasper failed to conduct a criminal investigation in response to Plaintiffs' reports that Defendant Perttu was assaulting them. They argue that, although Defendant Rajala reported the alleged abuse to the relevant MDOC officials, such action was inadequate and equivalent to doing nothing at all. Plaintiffs contend that, having been informed of the abuse, Defendants Rajala and Gasper violated Plaintiffs' rights under the Eighth Amendment by not pursuing a criminal investigation and prosecution against Defendant Perttu.

A private citizen "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Diamond v. Charles*, 476 U.S. 54, 64 (1986). Simply put, Plaintiffs cannot compel a criminal prosecution of Defendants because private citizens, whether or not they are incarcerated, cannot compel a criminal prosecution of another. *See Diamond*, 476 U.S. at 64–65; *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *Martin v. Koljonen*, No. 03-2169, 2004 WL 445720, at *1 (6th Cir. Mar. 9, 2004). As a consequence, Plaintiffs' allegations against Defendants Rajala and Gasper fail to state a claim.

### C. Defendants Neimi, Taskila, & Washington—Response to Perttu's Actions

Plaintiffs allege in Claim 4 that Defendants Neimi failed to process their grievances. They allege in Claim 2 that Defendants Taskila and Washington failed to take action to punish Defendant Perttu, despite having been informed of his conduct.

To the extent that Plaintiffs allege in Claim 4 that Defendant Neimi failed to ensure that their grievances about Defendant Perttu were processed and in Claim 2 that Defendants Taskila and Washington failed to take action to punish Defendant Perttu after receiving written

18

and oral complaints from Plaintiffs, Plaintiffs fail to state an actionable § 1983 claim.  Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.

Plaintiff has failed to allege that Defendants Neimi, Taskila, and Washington engaged in active unconstitutional behavior related to Defendant Perttu's abuse.  As a consequence, Plaintiffs' Eighth Amendment claim against Defendants Neimi, Taskila, and Washington, as raised in Counts 2 and 4, will be dismissed for failure to state a claim.

### D.  Defendants Neimi & Taskila—Denial of Medical Care

Plaintiffs allege in Claim 3 that Defendants Neimi and Taskila refused to provide them medical care and refused to allow others to do so, Plaintiffs' allegations are sufficient to state an Eighth Amendment claim.  A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer*, 511 U.S. at 834.  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial

19

risk of serious harm.  *Id.*  The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008).  Obviousness, however, is not strictly limited to what is detectable to the eye.  Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear.  *See, e.g., Rouster v. Saginaw Cnty.*, 749 F.3d 437, 446–51 (6th Cir. 2014) (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious).

Here, Plaintiffs describe significant, visible injuries sustained by Plaintiffs during Defendant Perttu's assaults, including severe facial and body bruising, a broken nose, and sprained limbs.  Assuming the allegations of the complaint to be true, Plaintiffs have stated Eighth Amendment claims against Defendants Neimi, Taskila for their denials of medical care.

### E.  Defendants Washington, Taskila, & Perttu—Denial of Pornography

In Counts V through VII of their complaint, Plaintiffs allege that Defendants Washington, Taskila, and Perttu have deprived them of pornography, causing significant psychological and physical suffering, in violation of the Eighth Amendment.  Plaintiffs also allege that, by depriving prisoners of sexually stimulating materials, Defendants have placed them at increased risk of predatory assaults by frustrated prisoners.

Plaintiff Richards has twice before raised an Eighth Amendment challenge to the deprivation of hard-core pornography, both of which were found meritless. In *Richards v. Snyder*, No. 1:14-cv-84, 2015 WL 3658836 (W.D. Mich. June 12, 2015), Plaintiff Richards claimed that the defendants unconstitutionally banned pornography from the prison, in violation of MDOC Policy Directive 04.07.112, "Prisoner Personal Property" (effective Dec. 12, 2013), and, thereby, violated his First and Eighth Amendment rights and a federal criminal statute, 18 U.S.C. § 2340. *Id.* at *8–11. This Court found no First or Eighth Amendment right to possess the banned pornography. In *Richards v. Heyns*, No. 1:14-cv-908, 2015 WL 1003117 (W.D. Mich. Mar. 6, 2015), Plaintiff Richards alleged that the MDOC Defendants had deprived him of adequate sensory stimulation because he did not have access to a television, electronic games, or pornography, in violation of the Eighth Amendment. The Court held that the Constitution did not give him a right to possess these items while he is in prison. *Id.* at *8–9

Yet Plaintiff Richards, together with his co-Plaintiffs, has again challenged the lack of hard-core pornography and other explicit content, citing portions of the prisoner personal property policy:

> Mail describing or depicting acts of sadism, masochism, bondage, necrophilia, or bestiality, or describing, depicting, or appearing to promote sexual acts involving children. This does not include small advertisements in a publication sent directly from the publisher or an authorized vendor except if the advertisement depicts or appears to promote sexual acts involving children.
>
> . . .
>
> Nude photographs, except if included in a publication sent directly from the publisher or an authorized vendor. Nude photographs are defined as any photograph exposing the buttocks (including photographs of an individual wearing a thong with the buttocks visible), pubic area or genitalia, or, except if a baby or infant, the female breast below the top of the areola. This includes exposure through "see through" materials.
>
> . . .

21

Photographs depicting actual or simulated sexual acts by one or more persons.  This includes photographs in a publication sent directly from the publisher or a vendor authorized by the facility.

. . .

Official photographs of a victim at a crime scene or depicting injuries to a victim sustained as a result of a crime that were taken for purposes of criminal investigation or prosecution.  This includes photographs of the autopsy of a victim.

MDOC Policy Directive (PD) 05.03.118(NN)(5), (13), (14), & (16).

As this Court previously discussed, the Eighth Amendment only guarantees access to the "minimal civilized measure of life's necessities," such as "food, medical care, or sanitation." *Rhodes*, 452 U.S. at 347–48.  Notwithstanding Plaintiffs' hyperbolic allegations that they suffer physical and mental distress from the lack of pornography, the deprivation does not create a condition "intolerable for prison confinement."  *Id.*; *see also Richards v. Snyder*, 2015 WL 3658836, at *11; *Richards v. Heyns*, 2015 WL 1003117, at *8–9.  The Constitution "does not mandate comfortable prisons."  *Rhodes*, 452 U.S. at 349.  Instead, the prohibition on hard-core pornographic material is at best an unpleasant experience, which is not barred by the Eighth Amendment.  *Ivey*, 832 F.2d at 954.  Plaintiffs' Eighth Amendment claim based on the denial of pornography therefore will be dismissed.

## VIII.   Equal Protection—Defendants Washington, Taskila, & Perttu

In Claims 5 and 7 of their complaint, Plaintiffs allege that Defendants Washington, Taskila, and Perttu have denied them equal access to sexually stimulating materials.  They contend that Defendants have violated their rights to equal protection under the Fourteenth Amendment by adopting and enforcing the policy directives on prisoner personal property, MDOC Policy

22

Directive (PD) 04.07.112 (effective Sept. 1, 2018), and prisoner mail, MDOC PD 05.03.118

(effective Mar. 1, 2018).  The mail policy bans, *inter alia*,[5] prisoners from receiving the following:

> Nude photographs, except if included in a publication sent directly from the publisher or an authorized vendor.  Nude photographs are defined as any photograph exposing the buttocks (including photographs of an individual wearing a thong with the buttocks visible), pubic area or genitalia, or, except if a baby or infant, the female breast below the top of the areola.  This includes exposure through "see through" materials.

MDOC PD 05.03.118(NN)(13).  The prisoner-property policy bans prisoners from possessing

property that violates the mail policy, and such property is deemed contraband.  *See* MDOC PD

04.07.112(E), (DD).  Plaintiffs suggest that the MDOC regulations discriminate against poor

prisoners, because they cannot afford to buy authorized magazines containing nudity, such as

*Playboy* and *ATM*.  (Compl., ECF No. 1, PageID.15.)

The Equal Protection Clause commands that no state shall "deny to any person

within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  A state

practice generally will not require strict scrutiny unless it interferes with a fundamental right or

discriminates against a suspect class of individuals.  *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307,

312 (1976).  The poor are not considered a suspect class because wealth is a fluctuating

characteristic unlike race or national origin.  *See Harris v. McRae*, 448 U.S. 297, 323 (1980)

("[T]his Court has held repeatedly that poverty, standing alone, is not a suspect classification.")

(citation omitted); *see also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973)

("wealth discrimination alone [does not] provid[e] an adequate basis for invoking strict scrutiny");

*City of Cleburne*, 473 U.S. 432, 438, 440–41 (discussing the immutable nature of personal

---

[5] Under Claims 5, 6, and 7 of their complaint, Plaintiffs challenge on other constitutional grounds a variety of other sub-paragraphs in PD 05.03.118(NN)—sub-paragraphs (5), (14), and (16)—which address other restrictions on pornographic or other explicit materials.  The only paragraph relevant to their equal protection claim, however, is sub-paragraph (13), because it is the only sub-paragraph that bans the receipt of the listed materials if they do not come through authorized vendors.

characteristics that can trigger strict scrutiny, or at least heightened scrutiny). Furthermore, "prisoners are not considered a suspect class for purposes of equal protection litigation." *Jackson v. Jamrog*, 411 F.3d 615, 619 (6th Cir. 2005); *see also Wilson*, 148 F.3d at 604.

Because neither a fundamental right nor a suspect class is at issue, Plaintiff's claim is reviewed under the rational basis standard. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby,* 470 F.3d 286, 298 (6th Cir. 2006). "Under rational basis scrutiny, government action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Id.* (quoting *Warren v. City of Athens,* 411 F.3d 697, 710 (6th Cir. 2005)). To prove his equal protection claim, Plaintiffs must demonstrate "intentional and arbitrary discrimination" by the state; that is, they must demonstrate that they "ha[ve] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Plaintiffs have not alleged that they have been intentionally treated differently from other prisoners who cannot afford to purchase sexually stimulating magazines. Plaintiffs also do not suggest that other prisoners, who cannot afford such magazines, are given those items without paying for them. Instead, they insist that they are entitled to have such magazines provided to them on an equal level with prisoners who can afford to purchase them. As discussed, indigency is not a protected characteristic. *Rodriguez*, 411 U.S. at 29. Courts have never held that prisoners—or any other citizens—have a fundamental constitutional right to possess spending money, much less sufficient money to purchase any item they may wish, at an equal level with other persons. Defendants' distinction between those who pay for optional materials and those

who are unable to pay for such items is entirely rational.  Accordingly, Plaintiffs fail to state an equal protection claim.

## IX.    First Amendment—Retaliation

In their fourth claim, Plaintiffs allege that Defendant Perttu retaliated against them for filing grievances by ripping up numerous grievances, placing them in the garbage, or failing to submit them.

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.*  Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The Court assumes without deciding that Plaintiffs' oral complaints and written grievances were nonfrivolous and constituted protected conduct that meets the first prong of the *Thaddeus-X* standard.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (recognizing that the filing of a nonfrivolous prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) (same); *see also Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018) (recognizing that a prisoner's right to file non-frivolous grievances against prison officials is protected conduct, regardless of whether the grievances are written or oral).

25

Plaintiffs' retaliation claims, however, fail at the second step.  To establish the second element of a retaliation claim, a prisoner-plaintiff must show adverse action by a prison official sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396.  The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted.  The relevant question is whether the defendants' conduct is "*capable* of deterring a person of ordinary firmness"; the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (emphasis in original).

Many courts, including this one, have held that the denial or refusal to process a grievance is not an adverse action.  *See, e.g.*, *Cameron v. Gurnoe*, No. 2:19-cv-71, 2019 WL 2281333, at *4–5 (W.D. Mich. May 29, 2019) (citing cases); *Branch v. Houtz*, No. 1:16-cv-77, 2016 WL 737779, at *6 (W.D. Mich. Feb. 26, 2016); *Ross v. Westchester Cnty. Jail*, No. 10 Civ. 3937(DLC), 2012 WL 86467, at *8 (S.D.N.Y. Jan. 11, 2012) (the refusal to file a grievance is, without more, insufficient to constitute an adverse action); *Stone v. Curtin*, No. 1:11-cv-820, 2011 WL 3879505, at *4 (W.D. Mich. Aug. 31, 2011) (the failure to process a prison grievance would not deter a prisoner of ordinary firmness from exercising his right to file a grievance); *Green v. Caruso*, No. 1:10-cv-958, 2011 WL 1113392, at *10 (W.D. Mich. Mar. 24, 2011) (the denial of a prisoner's grievances is not sufficiently adverse to support a retaliation claim); *Burgos v. Canino*, 641 F. Supp. 2d 443, 454 (E.D. Pa. 2009), *aff'd*, 358 F. App'x 302 (3d Cir. 2009) (the rejection or denial of prison grievances does not constitute an adverse action for purposes of a retaliation claim).

Refusing to process a grievance could not deter a person of ordinary firmness from engaging in protected conduct because it does not have any adverse consequences.  Prisoners do not have a right to an effective grievance procedure, and they suffer no consequences for filing a

grievance that is not processed.  It is true that a prisoner must exhaust available administrative remedies before bringing a civil rights claim in court, *see* 42 U.S.C. § 1997e(a), but even assuming that Defendant Perttu improperly prevented Plaintiffs from filing particular grievances, Defendant could not have prevented Plaintiffs from pursuing a civil rights claim based on an issue raised in those grievances.  If Defendant thwarted Plaintiff's ability to use the grievances process, then the process was not "available" to Plaintiff for that claim, and exhaustion would not be a prerequisite for initiation of a civil rights action.  *See Ross v. Blake*, 136 S. Ct. 1850, 1858–59 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio*, 20 F. App'x 469, 470 (6th Cir. 2001).

Because Plaintiffs fail to allege that Defendant Perttu took adverse action against them, their fourth claim against Defendant Perttu fails to state a claim.

## X.      First Amendment—Freedom of Expression

In their seventh claim for relief, Plaintiffs allege that Defendants, by adopting and applying a prison policy that limits the types and sources of pornography, have violated Plaintiffs' First Amendment rights to freedom of expression.

The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.  A prisoner's claim about censorship of his communications arises under the First and Fourteenth Amendments' guarantee of freedom of speech.  *See Procunier v. Martinez*, 416 U.S. 396, 408 (1974) (citing *Lamont v. Postmaster General*, 381 U.S. 301 (1965) (other citations omitted)); *see also Turner v. Safley*, 482 U.S. 78, 85 (1987).

27

As continually emphasized by the Supreme Court, however, the problems of prison administration are peculiarly for resolution by prison authorities and their resolution should be accorded deference by the courts.  *See Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001); *Washington v. Harper*, 494 U.S. 210, 224 (1990); *Turner*, 482 U.S. at 84–96; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 125–26 (1977).  These concerns are even stronger when a state penal institution is involved.  *Glover v. Johnson*, 138 F.3d 229, 241 (6th Cir. 1998).  As a result, the Supreme Court has held that "a prison inmate retains [only] those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  Prisoners' free speech rights are "uncontrovertedly limited by virtue of [their] incarceration."  *Thaddeus-X*, 175 F.3d at 393.  Prison officials may impinge on these constitutional rights if the regulation "is reasonably related to legitimate penological interests."  *See Turner*, 482 U.S. at 89.

To determine whether prison restrictions on mail are reasonably related to a legitimate penological interest, the Court must assess the restriction by reference to the following factors:  (1) whether there exists a valid, rational connection between the prison regulation and the legitimate governmental interest; (2) whether there remain alternative means of exercising the right; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.  *Turner*, 482 U.S. at 89–90.  Applying this standard, the Supreme Court has upheld a variety of limitations on First Amendment protections.  *See Shaw*, 532 U.S. at 229 (holding that prisoners do not have a First Amendment right to provide legal assistance to other

prisoners) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (sustaining proscriptions on media interviews)); *Thornburgh v. Abbott*, 490 U.S. 401, 419 (1989) (applying *Turner* standard to a prison ban on certain publications); *Turner*, 482 U.S. at 93 (restricting inmate-to-inmate correspondence).  *See also North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. at 133 (upholding prohibition on prisoner labor unions).

In *Thornburgh*, 490 U.S. 401, the Supreme Court addressed whether the Federal Bureau of Prisons' restrictions on various sources and types of incoming publications violated the First Amendment.  The Court upheld a regulation that barred, among other things, all "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity." *Id.* at 405 n.5.  The Court recognized the legitimacy of the prison's security interest, observing that incoming communications addressed to a general audience, which were likely to circulate, had the capacity to create "coordinated disruptive conduct." *Id.* at 412.  Applying the *Turner* standard to both facial and as-applied challenges, the Court concluded that a Bureau of Prisons' ban on certain types and sources of publications, including a ban on sexually explicit materials, withstood a facial challenge but was unconstitutional as applied to certain exclusions at issue in the case. *Id.* at 404.   In considering the availability of alternative means of exercising the right, the Court indicated that the "'right' in question must be viewed sensibly and expansively." *Id.* at 417.  Applying that principle, the Court found that the availability-of-alternative-means inquiry was satisfied because "the regulations permit a broad range of publications to be sent, received, and read." *Id.* at 418.  Finally, in determining whether there existed obvious, easy alternatives to the restriction, the *Thornburgh* Court recognized that the fact that the regulation bears a reasonable relationship to the legitimate governmental interest is evidence that no obvious and easy alternative is available, and vice versa.

*Id.*  The *Thornburgh* Court concluded that the "regulations, on their face, are not an 'exaggerated response' to the problem at hand:  no obvious, easy alternative has been established."  *Id.*

In unpublished decisions, the Sixth Circuit has addressed challenges to prior versions of MDOC Policy Directive 05.03.118.  *See Ward v. Jones*, No. 02-1924, 2003 WL 1795736, at *1 (6th Cir. Mar. 31, 2003) (analyzing MDOC Policy Directive 05.03.118(EE)(14) (effective Jan. 1, 2001), *amended* ¶ DD(14) (effective Mar. 12, 2001) (prohibiting "photographs depicting actual or simulated sexual acts").  Applying *Turner*, the *Ward* Court concluded that the 2001 policy was reasonably related to the legitimate penological interest of prison security.  *See Ward*, 2003 WL 1795736, at *2.   The Court further noted that Michigan prisoners may still receive less explicit photographs of a sexual nature.  *Id.*   In *Rogers v. Martin*, 84 F. App'x 577, 579 (6th Cir. 2003), the Sixth Circuit also upheld a prior version of MDOC Policy Directive 05.03.118, which prohibited the introduction of magazines containing actual or simulated sexual acts, one of the challenges at issue in the instant case:

> [T]he MDOC policy did not violate the First Amendment because: (1) it was rationally related to the goal of a safer prison environment; (2) prisoners had alternative means of acquiring sexually explicit materials such as written descriptions of sex acts and nude photographs that do not depict sexual acts; (3) accommodating the prisoners' right to receive sexually explicit materials in the form of photographs of sexual acts could adversely affect prison guards, other inmates, and the allocation of prison resources by creating a sexually charged atmosphere; and (4) redacting every publication containing photographs that violate the rule is not a ready alternative to disposing of the offending magazines because of the administrative burden of case-by-case redaction.  *See Turner v. Safley*, 482 U.S. 78, 90–91 (1987).  Although Rogers argued to the contrary, the defendants were not required to submit evidence that the banned materials actually caused problems in the past or are likely to cause problems in the future, as long as it is plausible that they believed the policy would further a legitimate objective.

*Rogers*, 84 F. App'x at 579 (citing *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999)).

District courts also have upheld MDOC Policy Directive 05.03.118.  *See Johnson v. Deeren*, No. 2:12-cv-205, 2012 WL 6019365, at **11-12 (W.D. Mich. Dec. 3, 2012) (finding

that the restriction of Penthouse for including "sexual simulated acts" in MDOC Policy Directive 05.03.118(MM)(14) (effective Sept. 14, 2009) was clearly related to a legitimate penological interest); *see also Houston v. Caruso,* No. 1:07-cv-960, 2008 WL 5235869, at *7 (W.D. Mich. Nov. 24, 2008) (upholding MDOC Policy Directive 05.03.118(HH)(15) (effective Jan. 1, 2006), which, like the current policy, prohibited photographs depicting actual or simulated sexual acts by one or more persons). Indeed, this Court previously upheld the policy against a First Amendment challenge in a case filed by Plaintiff Richards. *See Richards v. Snyder*, 2015 WL 3658836, at *8–11.

Moreover, after *Thornburgh*, numerous other courts have addressed prison pornography policies both stricter than and similar to the policy at issue in the instant case. For example, in *Sisney v. Kaemingk*, 866 F.3d 692 (8th Cir. 2018), the court applied the *Turner* test to a challenge to a prison policy more restrictive than the MDOC policy. In *Sisney*, the policy prohibited "the purchase, possession and attempted possession and manufacturing of pornographic materials by offenders" in the South Dakota Department of Corrections (SDDOC). *Id.* at 694. "'Pornographic material' [wa]s defined to include "books, articles, pamphlets, magazines, periodicals, or any other publications or materials that feature nudity or 'sexually-explicit' conduct . . . [as well as] photographs, drawings, etchings, paintings, or other graphic depictions of nudity or sexually explicit material." *Id.* (quoting SDDOC, Policy No. 1.3.C.8, *Pornography* (2014)). "Nudity" and "sexually explicit" were defined similarly to the MDOC policy, but the term "'sexually explicit' cover[ed] both images and writings that depicted actual or simulated sexual acts. *Id.* The policy applied to both outgoing and incoming mail, such mail was treated as contraband and confiscated, and possession of any excluded materials was cause for disciplinary action. *Id.* Plaintiffs in the action raised, in relevant part, a facial challenge to the ban on all

sexually explicit material, both pictorial and written, and the ban on such materials in outgoing mail. They also raised challenges to overly broad interpretations of pornography, nudity, and sexually explicit materials and as-applied challenges to the rejection of certain comics, Renaissance images, and a Coppertone poster. *Id.* at 695.

Applying *Turner*, the Eighth Circuit accepted that the prison officials' "general penological interests served by prison bans on sexually explicit materials, including institutional security, rehabilitation, and the prevention of sex crimes in prison, as well as a reduction in sexual harassment directed at staff . . ." were legitimate. *Id.* The court, however, remanded the case to the district court for consideration under *Turner* of the later-adopted version of the rule, which the district court had failed to address. On remand, the district court again accepted as legitimate the governmental objectives. *Sisney v. Kaemingk*, 469 F. Supp. 2d 903, 911 (D.S.D. 2020). The court then applied *Turner* to the various as-applied challenges, reaching varying results, but the court upheld a facial challenge to the policy insofar as it included the word "nudity" within its definitions of "pornographic material" and "sexually explicit." With the excision of the word, the policy was found not to be overbroad and not to violate the First Amendment. *Id.* at 911–12.

The Ninth Circuit, in *Mauro v. Arpaio*, 188 F.3d 1054 (9th Cir. 1999), determined that a jail's policy of excluding sexually explicit materials was rationally and reasonably related to the legitimate governmental interest in jail security, rehabilitation, and reducing sexual harassment of female detention officers. *Id.* at 1059–60. While noting that rehabilitation was not a legitimate interest for those not yet convicted, the interest was legitimate for convicted inmates, and prison security and the prevention of harassment were legitimate goals with respect to all jail inmates. *Id.* at 1059 n.1. Moreover, the court found that there existed ample alternative means of exercising the right, including the receipt of sexually explicit written materials and sexually

suggestive photographs of clothed models.  *Id.* at 1061.  Further, the court held that the plaintiff had not met his burden of identifying an obvious and easy alternative to the restriction, given the cost of a hostile work environment for female employees and the likelihood of fights among prisoners.  *Id.* at 1061–62 (reiterating that the burden was on the prisoner, not prison officials, to show that there are obvious and easy alternatives to the regulation) (citing *O'Lone*, 482 U.S. at 350, and *Turner*, 482 U.S. at 91).

Similarly, in *Amatel v. Reno*, 156 F.3d 192 (D.C. Cir. 1998), the District of Columbia Circuit upheld a federal statute and its implementing regulations, which barred federal prisoners from receiving "sexually explicit" materials or those that "feature[] nudity," *id.* at 194, finding that the restriction fostered the legitimate governmental interest in rehabilitation.  *Id.* at 197.  The court held that, in determining reasonableness, case-by-case assessments were not required, and the government did not need to be correct in its assessment of the relationship between the governmental interest and the restriction—it needed only to be reasonable in that assessment.  *Id.* at 198.  The court concluded the restriction was reasonable in part because that the restriction applied only to pictorial, not written, materials and did not include illustrative materials with "medical, educational or anthropological content."

Likewise, in *Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999), the Third Circuit upheld a New Jersey legislative restriction on the possession of any sexually oriented material, written or pictorial, at a particular institution that provided intensive sex-offender treatment. Relying substantially on *Amatel*, 156 F.3d at 198–99, the *Waterman* court concluded that the restriction was rationally related to the state's asserted legitimate penological interest in rehabilitation of sexual offenders.  *Id.* at 214–18.  In addition, the court found that, in assessing the availability of other means of exercising the right, the *Thornburgh* Court required a broad reading

33

of the "right" in issue, and it held that plaintiffs retained access to a wide range of other expressive

materials.  *Id.* at 218–19.  Finally, the court concluded that the plaintiffs' proposed alternative of

requiring staff to review all incoming publications on a case-by-case basis imposed far from *de*

*minimis* costs on the facility.  *Id.* at 220.  Under *Turner*, therefore, the restriction on sexually

explicit materials did not violated the plaintiffs' First Amendment rights.

        Numerous other courts have upheld limitations on prisoner access to sexually

explicit materials.  *See, e.g., Josselyn v. Dennehy*, 333 F. App'x 581 (1st Cir. 2009) (upholding

regulation barring inmate possession of sexually explicit material); *Frost v. Symington*, 197 F.3d

348 (9th Cir. 1999) (upholding ban on sexually explicit sexual material "showing penetration");

*Owen v. Wille*, 117 F.3d 1235 (11th Cir. 1997) (upholding an individualized ban on sexually

explicit material); *Bahrampour v. Lampert*, 356 F.3d 969 (9th Cir. 2004) (holding that prison

officials did not violate the inmate's First or Fourteenth Amendment rights when they rejected

magazines containing sexually explicit pictures and role-playing games); *Moses v. Dennehy*, 523

F.Supp.2d 57 (D. Mass. 2007), *aff'd*, 333 F. App'x 581 (1st Cir. 2009) (upholding Massachusetts

Department of Corrections' ban on all sexually explicit publications and items); *Sperry v.*

*Werholtz*, 413 F. App'x 31 (10th Cir. 2011) (prison regulation prohibiting possession of sexually

explicit material did not violate an inmate's right to receive information while in prison);

*Alexander v. Cal. Dep't of Corr.*, 2012 WL 439498 (E.D. Cal. 2012) (R. & R.) (recommending

summary judgment to defendant on prisoner's challenge to regulation prohibiting the possession

of non-obscene, sexually explicit materials—e.g., adult magazines—concluding that, under

*Turner*, the regulation passes constitutional muster because it was implemented in order to stop

the sexual harassment of female correctional officers), *aff'd*, 564 F. App'x 330 (9th Cir. 2014); *see*

*also Jewell v. Gonzales*, 420 F. Supp. 2d 406 (W.D. Pa. 2006) (upholding a federal prohibition on

the showing of unedited R-rated films to inmates, the prohibition was constitutional because it was rationally connected to a legitimate and neutral government interest and alternative means to exercise related constitutional rights existed, including G, PG, PG-13, edited R-rated films, and television).

In the instant case, Plaintiffs raise only a facial challenge to the MDOC policy, as they do not contest the application of the policy to specific mail rejections.  The policy in issue is significantly less restrictive or no more restrictive than numerous policies upheld in the previously cited cases as rationally related to the specific legitimate governmental interests identified by the MDOC, which restricts incoming "mail that may pose a threat to the security, good order, or discipline of the facility, facilitate or encourage criminal activity, or interfere with the rehabilitation of the prisoner," MDOC PD 05.03.118(NN).  The policy statement concludes that the mail listed in the numbered subparagraphs "pose such risks under all circumstances . . . ." *Id.*

Further, as discussed, all courts that have addressed the issue have upheld such policies based on the specific governmental interests identified by the MDOC.  *See, e.g., Rogers*, 84 F. App'x at 579 (upholding earlier version of MDOC PD 05.03.118, which restricted the introduction of magazines containing actual or simulated sex acts on the ground that it was reasonably related to prison security); *Sisney*, 866 F.3d at 695 (holding that stricter policy than that of MDOC is reasonably related to legitimate governmental interests of "institutional security, rehabilitation, and the prevention of sex crimes in prison, as well as a reduction in sexual harassment directed at staff"); *Amatel*, 156 F.3d at 197 (concluding that complete ban on nudity and other sexually explicit materials reasonably related to legitimate governmental interest in rehabilitation); *Waterman*, 183 F.3d 208 (finding ban on nudity and all sexually explicit materials, including written and pictorial representations, reasonably related to rehabilitation); *Mauro*, 188

35

F.3d at 1059 (concluding that a ban on sexually explicit materials is reasonably related to legitimate governmental interests in maintaining security, rehabilitation, and reducing sexual harassment); *Josselyn*, 333 F. App'x at 584–86 (upholding ban on nudity and sexually explicit materials as reasonably related to legitimate interest in prison security); *Frost*, 197 F.3d at 356–57 (finding ban on sexually explicit sexual material showing penetration is rationally related to interests of prison safety, protecting female officers from abuse, and limiting other harassment); *Owen*, 117 F.3d 1235 (upholding an individualized ban on sexual material); *Bahrampour*, 356 F.3d 969 (upholding rejection of magazines containing sexually explicit pictures and role playing games as reasonably related to decreasing violent behavior and gambling, which compromise institutional safety); *Moses*, 523 F. Supp. 2d 57 (finding that ban on all sexually explicit publications and items is rationally related to legitimate governmental interest in prison safety and rehabilitation); *Sperry*, 413 F. App'x 31 (concluding that ban on prisoner possession of sexually explicit material is rationally connected to legitimate interests in protecting institutional security, facilitating the rehabilitation of sex offenders, and preventing sexual harassment).  Based on this extensive authority and an absence of authority to the contrary, it is clearly established that the governmental interests cited by the MDOC are legitimate and neutral and bans like the one challenged here are rationally related to those interests.

To the extent that Plaintiffs argue in Claim 6 that the banning of hardcore, sexually explicit materials undermines prison safety, rather than serving the interest of safety, they cannot prevail.  To show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned material actually caused problems in the past, or that the materials are "likely" to cause problems in the future.  *See Thornburgh*, 490 U.S. at 417. The courts owe judicial deference "to corrections officials . . . in gauging the validity of the

regulation." *Turner*, 482 U.S. at 92.  It does not matter whether Plaintiffs disagree with the

MDOC's evaluation of the risks, as long as the governmental assessment is rational.  *Amatel*, 156

at 199.

Plaintiffs also fail to meet the second prong of *Turner*, whether there are alternative

means of exercising the right.  The MDOC policy does not entirely prohibit pornographic or

sexually explicit materials, either pictorial or written.  Ample alternative means of addressing the

right exist, even narrowly defined as the right to sexually stimulating materials.  The policy permits

materials containing full nudity, though it restricts the source of such materials to those sent

directly from the publisher or an authorized vendor.  MDOC PD 05.03.118(NN)(13).  Notably,

this restriction on the source of the material does not treat sexually explicit materials differently

than other materials; the prison prohibits all publications, unless they are received directly from

the publisher or an approved vendor.  *See* MDOC PD 05.03.118(NN)(8).  Moreover, while the

policy prohibits "[p]hotographs depicting actual or simulated sexual acts by one or more persons,"

MDOC PD 05.03.118(NN)(14), it does not restrict written descriptions of such acts.  Similarly,

the policy does not prohibit written descriptions of crime scenes or victims or autopsy

photographs—only official photographs of those matters.  MDOC PD 05.03.118(NN)(16).  In fact,

the prison only prohibits both pictorial and written materials if those materials "describe[e] or

depict[] acts of sadism, masochism, bondage, necrophilia, or bestiality, or describe[e], depict[], or

appear[] to promote sexual acts involving children."[6]  MDOC PD 05.03.118(NN)(5).  Even then,

the policy exempts from the restriction "small advertisements in a publication sent directly from

the publisher or an authorized vendor except if the advertisement depicts or appears to promote

---

[6] The Court notes that many of the precluded materials under this subsection, such as necrophilia, bestiality, and sexual acts involving children, violate state criminal law, and therefore implicate an additional legitimate governmental interest.

sexual acts involving children." *Id.* Finally, the policy prohibits the receipt of "[o]fficial photographs of a victim at a crime scene or depicting injuries to a victim sustained as a result of a crime that were taken for purposes of criminal investigation or prosecution. This includes photographs of the autopsy of a victim." MDOC PD 05.03.118(NN)(16). Again, the policy permits inmates to receive written descriptions of such materials. Thus, Plaintiffs have ample alternative means of accessing sexually stimulating and other explicit materials. *See Rogers*, 84 F. App'x at 579; *Richards v. Snyder*, 2015 WL 3658836, at *11.

Further, the third factor of *Turner* requires consideration of the impact that accommodating Plaintiffs' interest would have on others, including guards and inmates. Here, as in *Thornburgh*, "the class of publications to be excluded is limited to those found potentially detrimental to order and security; the likelihood that such material will circulate within the prison raises the prospect of precisely the kind of 'ripple effect' with which the Court in *Turner* was concerned. *Thornburgh*, 490 U.S. at 418. In these circumstances, "the right in question 'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike,' . . . [and] the courts should defer to the 'informed discretion of corrections officials.'" *Id.* (quoting *Turner*, 482 U.S. at 90, 92). "Where exercise of a right requires this kind of tradeoff, we think that the choice made by corrections officials—which is, after all, a judgment 'peculiarly within [their] province and professional expertise,'[]—should not be lightly set aside by the courts." *Turner*, 482 U.S. at 92–93 (quoting *Pell,* 417 U.S. at 827); *see also Ward*, 64 F. App'x at 424; *Richards v. Snyder*, 2015 WL 3658836, at *11.

Finally, Plaintiffs utterly fail to meet their burden of identifying any easily implemented and equally effective alternative to the MDOC restrictions that would protect their rights at a *de minimis* cost to the penological interests. *Thornburgh*, 490 U.S. at 418; *O'Lone*, 482

U.S. at 350, and *Turner*, 482 U.S. at 90–91.  Nor has any other court facing a similar restriction found an obvious and easy alternative that would accommodate the claimed right at *de minimis* cost to the identified valid penological concerns.  This Court previously has recognized that "redacting every publication containing photographs that violate the rule is not a ready alternative because of the administrative burden of a case-by-case redaction."  *Richards v. Snyder*, 2015 WL 3658836, at *11 (citing *Ward*, 84 F. App'x at 579).  Plaintiffs' claim therefore fails on the fourth *Turner* element.

Because Plaintiffs fail to allege facts that support any—much less all—of the elements of their First Amendment challenge to the MDOC policy, their allegations fail to state a claim under the First Amendment's free speech clause.

## XI.     First & Fourteenth Amendments—Banning of Dungeons and Dragons

In their eighth and final claim, Plaintiffs allege that Defendants, by banning the game "Dungeons and Dragons" (D&D) while permitting Bible trivia games, Bible flashcards, and Bible puzzles, have discriminated against Wiccans, whose mythology has been incorporated into D&D.  By invoking the Fourteenth Amendment, Plaintiffs presumably allege a violation of the Equal Protection Clause of the Fourteenth Amendment.  Plaintiffs also contend that the prohibition of D&D violates the First Amendment religious rights of Wicca adherents.

For a plaintiff to invoke federal jurisdiction to bring suit in the federal courts, he must demonstrate standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992); *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004).  Standing is central to the "case-or-controversy" requirement associated with Article III of the Constitution.  *Juidice v. Vail*, 430 U.S. 327, 331 (1977).  Even if the parties have not raised the issue, a court is "obligated to consider the issue *sua sponte*, if necessary."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 488 n.4 (1980) (Rehnquist, J., dissenting); *see also Juidice*, 430 U.S. at 331.  Plaintiffs have the burden of demonstrating that

39

they (1) "suffered an 'injury in fact;'" (2) that is "'fairly . . . trace[able] to the challenged action of

the defendant;'" and (3) that the injury is likely to be "'redressed by a favorable decision.'" *Lujan*,

504 U.S. at 560–61 (citations omitted). To survive review of standing at the pleading stage,

Plaintiff need only make "general factual allegations of injury resulting from the defendant's

conduct" to "'support the claim.'" *Id.* at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871,

889 (1990)).

In the instant case, no Plaintiff alleges that he is a practitioner of Wicca. As a

consequence, Plaintiffs cannot demonstrate that one or more of them suffered either a First

Amendment or equal protection injury arising out of the banning of D&D. And Plaintiffs lack

standing to assert the constitutional rights of other prisoners. *Newsom v Norris*, 888 F.2d 371, 381

(6th Cir. 1989) (citing *McGowan v. State of Maryland*, 366 U.S. 420, 429 (1961)); *Raines v.

Goedde*, No. 92-3120, 1992 WL 188120, at *2 (6th Cir. Aug. 6, 1992).

Moreover, federal law specifies that cases in the courts of the United States may be

conducted only by the parties personally or through counsel. 28 U.S.C. § 1654. That statute

provides that, "in all courts of the United States, the parties may plead and conduct *their own cases*

personally or by counsel, as, by the rules of such courts, respectively, are permitted to manage and

conduct causes therein." 28 U.S.C. § 1654 (emphasis added). The statute clearly makes no

provision for a *pro se* party to represent others. The federal courts long have held that section

1654 preserves a party's right to proceed *pro se*, but only with respect to her own claims. Only a

licensed attorney may represent other persons. *See Rowland v. Calif. Men's Colony, Unit II Men's

Advisory Council*, 506 U.S. 194, 201–03 (1993); *United States v. 9.19 Acres of Land*, 416 F.2d

1244, 1245 (6th Cir. 1969). Because Plaintiffs are not licensed attorneys, they are prohibited from

representing others in federal court.

Both because they lack standing and are not attorneys, Plaintiffs' eighth claim will be dismissed.

## XII.    Pending motions

Plaintiff Richards has filed six motions that remain pending before the Court[7]:  (1) a request for expedited hearing (ECF No. 5); (2) a motion for declaratory ruling on the application and interpretation of foreign law (ECF No. 15); (3) a motion to disqualify the undersigned and to change venue (ECF No. 16); (4) a motion for federal investigation and monitoring (ECF No. 17); (5) a motion seeking a preliminary injunction to freeze federal aid benefits to the State of Michigan (ECF No. 18); and (6) a motion to appoint counsel (ECF No. 19).

### A.  Motion for declaratory ruling on application of international law

Plaintiff Richards seeks a declaratory ruling that the Universal Declaration of Human Rights and the International Convention Against Inhumane and Degrading Treatment of Prisoners and Torture are sources of law that provide a cause of action to Plaintiffs.  As the Court held in section IV of this opinion, neither international agreement creates a cause of action.  The motion therefore will be denied.

### B.  Motion to disqualify and change venue

Plaintiff Richards seeks to disqualify the undersigned and to change venue.  He complains that the undersigned and other judges of this district are partnered with the MDOC and biased against him, and he alleges that Defendant Perttu claims to personally know every judge of the district.

---

[7] Because three Plaintiffs have signed the complaint, all motions filed in this action must be signed by all Plaintiffs. As discussed, under 28 U.S.C. § 1654, an individual has a right to proceed *pro se*, but only with respect to their own claims.  *See Rowland*, 506 U.S. at 201–03.  Therefore, no pro se litigant may represent another.  As a result, a motion filed by only one Plaintiff, fails to meet the requirement of Rule 11(a) of the Federal Rules of Civil Procedure.  *Id.* ("Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's individual name—or by a party personally if the party is unrepresented.").  The Court will address the claims on the merits.  However, any future motion signed only by Plaintiff Richards or any other individual Plaintiff will be rejected.

Under 28 U.S.C. § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The provision requires a judge to *sua sponte* recuse himself if he knows of facts that would undermine the appearance of impartiality. *Youn v. Track, Inc.*, 324 F.3d 409, 422–23 (6th Cir. 2003); *Liteky v. United States*, 510 U.S. 540, 547–48 (1994). In addition, 28 U.S.C. § 144 requires that "[w]henever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding." *Id.* An affidavit filed under § 144 must "allege[] facts which a reasonable person would believe would indicate a judge has a personal bias against the moving party." *Gen. Aviation, Inc. v. Cessna Aircraft, Co.*, 915 F.2d 1038, 1043 (6th Cir. 1990). The alleged bias must "stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966). Extrajudicial conduct encompasses only "personal bias as distinguished from a judicial one, arising out of the judge's background and association and not from the judge's view of the law." *Youn*, 324 F.3d at 423 (internal quotation marks omitted). "Personal" bias is prejudice that emanates from some source other than participation in the proceedings or prior contact with related cases. *Id.* (citing *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251–52 (6th Cir. 1989)); *Demjanjuk v. Petrovsky*, 776 F.2d 571, 577 (6th Cir. 1985)).

Plaintiff complains that the judges of this court have ruled against him and are partnered with the MDOC to rule against all prisoners. To the extent that Plaintiff argues that the undersigned and Magistrate Judge Vermaat have previously ruled against him, Plaintiff Richards

alleges bias that arises strictly from a judicial source, which is not a basis for disqualification. *Youn*, 324 F.3d at 423.  To the extent that Plaintiff alleges that the Court has partnered with the MDOC to rule against prisoners or that the undersigned has a personal relationship with any Defendant, his allegations are both untrue and wholly conclusory.  The undersigned has no personal relationship with any Defendant.  The mere fact that Defendant Perttu or any other Defendant claimed to know the undersigned is not evidence of such a relationship.

With respect to Plaintiff Richards' request to transfer venue to the Eastern District of Michigan, the request will be denied.  The action was transferred from the Eastern District to this Court on September 30, 2020 (ECF No. 7), because venue was proper only in this district. *See* 28 U.S.C. § 1406(a).  All Defendants reside in this district and the facts underlying the complaint occurred in this district.  As a consequence, venue properly lies in this and no other district.

Plaintiff Richards' motion (ECF No. 16) therefore will be denied.

### C.  Motions seeking preliminary injunctive relief

In his "Motion for Federal Investigation and Monitoring" (ECF No. 17), Plaintiff Richards seeks preliminary injunctive relief in the form of an order barring Defendant Perttu and a non-Defendant mail-room officer from destroying, falsifying, or interfering with his mail. Specifically, he complains that pages are occasionally missing from his motions and that they sometimes are "edited" by facility staff.  He requests that the FBI and United States Marshals Office be ordered to conduct an investigation into the matter.  In his "Motion for Preliminary Injunction and Request for Freezing of Federal Aid Benefits to the State of Michigan," Plaintiff contends that he is entitled to an injunction to freeze federal aid to the State of Michigan in order to secure his recovery of damages in this action and to enforce the PREA.  Finally, in his motion seeking expedited relief, Plaintiff seeks an unspecified emergency ruling.

Preliminary injunctions are "'one of the most drastic tools in the arsenal of judicial remedies.'" *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)).  The issuance of preliminary injunctive relief is committed to the discretion of the district court.  *See Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000).  In exercising that discretion, a court must consider whether plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction.  *Nader*, 230 F.3d at 834.  These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also S. Galzer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) ("[T]hese are factors to be balanced, not prerequisites to be met."); *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013) (same); *Ne. Ohio Coal.*, 467 F.3d at 1009 (same); *Nader*, 230 F.3d at 834 (same).  "But even the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'"  *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).  Moreover, where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting.  *See Glover v. Johnson*, 855 F.2d 277, 286 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432, 438 & n.3 (6th Cir. 1984).  The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the

circumstances.  *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).  Preliminary injunctions are not favored, and a movant is not necessarily entitled to such relief, even if the movant has shown a likelihood of success on the merits.  *Benisek v. Lamone*, ___ U.S. ___, 138 S. Ct. 1942, 1943–44 (2018).

Plaintiff's allegations of interference with his mail are wholly conclusory. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to establish a constitutional violation.  *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. The fact that a page of a document may occasionally be lost or uncopied is not evidence that any person intentionally interfered with the mail.  In addition, Plaintiff provides no specifics concerning any alleged alterations by any Defendant in this action.  As a consequence, Plaintiff's motion for an injunction against mail interference is wholly unsupported and without merit.

Further, as earlier discussed, Plaintiff has no right to demand a criminal investigation of any claim.  *Diamond*, 476 U.S. at 64–65.  In addition, Plaintiff has alleged no facts warranting such an investigation.  As a consequence, Plaintiff's request for an investigation by the FBI and the Marshal is denied.

Plaintiff's demand for the freezing of federal aid under the authority of the PREA fails for the reasons previously stated—Plaintiff has no cause of action under the PREA.  Further, no basis exists for freezing assets to secure any potential recovery.  To the extent that Plaintiff seeks damages from Defendants in their official capacities, he seeks damages from the State of Michigan.  Official-capacity lawsuits "generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citing *Monell*, 436 U.S. at 690, n. 55).  An official-capacity suit is to be treated as a suit against

the entity itself.  *Id*. at 166 (citing *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)); s*ee also Matthew v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).  "Individuals sued in their official capacities stand in the shoes of the entity they represent."  *Alkire*, 330 F.3d at 810; *Graham*, 473 U.S. at 165-66.

Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994).  Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court.  *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).  In numerous opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from a § 1983 suit under the Eleventh Amendment.  *See, e.g.*, *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013); *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 962 (6th Cir. 2013); *McCoy v. Michigan*, 369 F. App'x 646, 653–54 (6th Cir. 2010).  The only limited exception to sovereign immunity exists for an official-capacity action seeking prospective injunctive relief.  *See Graham*, 473 U.S. at 167 n.14; *Ex Parte Young*, 209 U.S. 123, 159–60 (1908) (Eleventh Amendment immunity does not bar prospective injunctive relief against a state official).  Because no damages may be awarded against the state, Plaintiff has absolutely no basis for securing his potential recovery from state funds or federal aid.

Finally, in his motion seeking expedited relief, Plaintiff seeks unspecified emergency relief.  Plaintiff provides no factual basis for granting such relief.  Moreover, at this juncture, most of Plaintiffs' claims have been dismissed, with the exception of certain Eighth Amendment claims arising out of past events.  Regardless of the merits of the remaining claims,

Plaintiff cannot demonstrate entitlement to preliminary injunctive relief under these circumstances, because he cannot show irreparable injury if the preliminary injunction does not issue.  *D.T.*, 942 F.3d at 326–27 (quoting *Friendship Materials, Inc.*, 679 F.2d at 105).

For these reasons, Plaintiff's motions seeking injunctive relief (ECF Nos. 5, 17, 18) will be denied.

### D.  Motion to appoint counsel

In his final pending motion, Plaintiff Richards requests a court-appointed attorney in this action.  Indigent parties in civil cases have no constitutional right to a court-appointed attorney.  *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993).  The Court may, however, request an attorney to serve as counsel, in the Court's discretion.  *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604–05; *see Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances.  In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiffs' apparent ability to prosecute the action without the help of counsel.  *See Lavado*, 992 F.2d at 606.  The Court has carefully considered these factors and determines that the assistance of counsel does not appear necessary to the proper presentation of Plaintiffs' position.   Plaintiff Richards' request for appointment of counsel (ECF No. 19) therefore will be denied.

### <u>Conclusion</u>

Having conducted the review required by the Prison Litigation Reform Act, the Court denies class certification and determines that Defendants Washington, Gasper, and Rajala will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court also will dismiss, for failure to state a claim, the following claims

against the remaining Defendants:  Plaintiffs' PREA and international law claims; their First, Eighth, and Fourteenth Amendment (equal protection) claims related to the prohibition on hard-core pornography and other explicit content; their due process claims; and their claim alleging religious discrimination and denial of equal protection based on the banning of Dungeons and Dragons.  In addition, the Court will dismiss, for failure to state a claim, Plaintiffs' retaliation claim against Defendant Perttu.  Plaintiffs' Eighth Amendment claims against Defendant Perttu for excessive force and sexual assault and their Eighth Amendment claims against Defendants Neimi and Taskila for denial of medical care remain in the case.  Plaintiff Richards' pending motions (ECF Nos. 5, 15–19) will be denied.  Plaintiff Richards will be barred from filing any further motions without obtaining the signatures of all Plaintiffs.  In addition, Plaintiff Richards will be barred from filing any future action alleging a violation of international human rights law or challenging MDOC PD 05.03.118(NN) respecting the limits on hard-core pornography.

An order consistent with this opinion will be entered.


Dated:   May 6, 2021                              /s/ Paul L. Maloney
                                                          Paul L. Maloney
                                                          United States District Judge