UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KYLE B. RICHARDS and                                    Case No. 2:20-cv-194
KENNETH DAMON PRUITT,

                            Plaintiffs,                 Hon. Paul L. Maloney
                                                        U.S. District Judge

        v.

UNKNOWN PERTTU,

                            Defendant.
_____/

## REPORT AND RECOMMENDATION

### I.    Introduction

        This Report and Recommendation (R&R) addresses whether Plaintiffs exhausted

their available administrative remedies prior to filing this lawsuit.   On December 19,

2022, the Court held an evidentiary hearing solely on the exhaustion issue.   That

hearing was completed on January 17, 2023.

        Plaintiffs — state prisoners Kyle B. Richards and Kenneth Damon Pruitt — filed

suit under 42 U.S.C. § 1983 on July 15, 2020.  In their verified complaint, Richards and

Pruitt, along with their former Co-Plaintiff Robert Kissee, alleged that while they were

confined at the Baraga Correctional Facility (AMF) in Baraga, Michigan, four employees

of the Michigan Department of Corrections (MDOC) and two employees of the Michigan

State Police (MSP) violated their rights under various federal and international laws.

         On May 6, 2021, this Court dismissed all but Plaintiffs' Eighth Amendment

claims that: (1) Defendant Resident Unit Manager (RUM) Thomas Perttu sexually

1

assaulted Plaintiffs, and (2) Defendants AMF Warden Kristopher Taskila and RUM Steve Neimi denied Plaintiffs medical care.  (ECF No. 27, PageID.188 (Opinion); ECF No. 28, PageID.189 (Order).)  On September 13, 2021, Defendants Neimi, Perttu, and Taskila moved for summary judgment on the basis that Plaintiffs failed to exhaust their administrative remedies prior to filing suit.  (ECF No. 48.)    Plaintiffs responded, asserting that Richards had exhausted the deliberate indifference claims against RUM Neimi and Warden Taskila, and that that they were thwarted from exhausting their Eighth Amendment claims against RUM Perttu.  (ECF No. 53, PageID.405-406.)  More specifically, Plaintiffs asserted that they were thwarted *by Perttu*, who on numerous occasions threatened them and intercepted and destroyed their grievances.  (*Id.*, PageID.406-408.)  In support of their thwarting claims, Plaintiffs pointed to the portions of their verified complaint wherein they alleged that RUM Perttu threatened them and destroyed grievances concerning their Eighth Amendment claims (ECF No. 1, PageID.10-11), and to witness declarations stating the same (ECF Nos. 14, 37).

    In rare circumstances, an administrative remedy will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance [or other administrative] process through machination, misrepresentation, or intimidation."  *Ross v. Blake*, 578 U.S. 632, 644 (2016).  The undersigned ultimately determined that there were no genuine issues as to the exhaustion of Plaintiffs' claims against Warden Taskila and RUM Neimi, and that Plaintiffs had not exhausted the

claims.  (ECF No. 80, PageID.592-594.)    But, because Plaintiffs made specific allegations of thwarting in their verified complaint relating to the exhaustion of their claims against Perttu, and because Plaintiffs provided declarations from prisoners who claimed to have witnessed the thwarting, the undersigned determined that there were genuine issues of material fact as to whether the grievance process was available to Plaintiffs with respect to their claims against RUM Perttu.  (*Id.*, PageID.594-595.)  The undersigned therefore issued an R&R recommending that the Court grant summary judgment as to Plaintiffs' claims against RUM Neimi and Warden Taskila and deny summary judgment as to Plaintiffs' claims against RUM Perttu.  (*Id.*, PageID.596.)  On February 9, 2022, the Court adopted the R&R over the Plaintiffs objections.[1]  (ECF No. 85, PageID.660.)

Meanwhile, on August 31, 2021, pursuant to *Lee v. Willey*, 789 F.3d 673 (6th Cir. 2015), and in anticipation of the Court finding that Richards created a genuine issue of fact as to whether he was thwarted from exhausting his administrative remedies, RUM

---

[1]    One objection advanced by Plaintiffs was that "exhaustion of remedies . . . was a clearly stated issue in claim #3 and #4.  Since this issue relates to a claim in controversy, a 'Willis' [sic] hearing cannot be held."  (ECF No. 82, PageID.599.)    The Court determined that this objection "allude[d] to issues in a perfunctory manner, without argument or development" and was therefore "abandoned and waived."  (ECF No. 85, PageID.659 (quoting *Brown v. City of Grand Rapids*, No. 16-2433, 2017 WL 4712064, at *1 (6th Cir. June 16, 2017)).)    The undersigned notes that Richards advanced this argument again during the evidentiary hearing in this case.  Presumably, Richards intended to refer to *Lee v. Willey*, 789 F.3d 673.  His argument appears to be that because Plaintiffs alleged that Perttu thwarted their attempts to exhaust in their complaint, the issue is triable to a jury as a matter of right.  Richards is mistaken.  As explained by the Court in *Willey*, exhaustion under the PLRA is a matter of judicial administration that may be resolved by an evidentiary hearing before a judge.  *Lee*, 789 F.3d at 678.  The administrative nature of the exhaustion requirement does not change simply because Plaintiffs include allegations of thwarting in their complaint.

Perttu requested an evidentiary hearing on the issue of exhaustion.  (*See* ECF No. 51, PageID.338 (Order Setting Evidentiary Hearing).)  Perttu also requested evidentiary hearings on exhaustion in two other cases involving similar allegations of thwarting: *Richards et al v. Perttu*, W.D. Mich. Case No. 2:20-cv-76 and *Richards v. Perttu*, W.D. Mich. Case No. 2:20-cv-122.  The Court granted Perttu's requests and scheduled evidentiary hearings in all three cases.[2]  After the November 4, 2021 evidentiary hearing in *Richards et al. v. Perttu*, W.D. Mich. Case No. 2:20-cv-76, Richards and Perttu agreed to incorporate the testimony and exhibits from that hearing into the evidentiary hearing in this case, and to narrow the scope of additional testimony to the time not covered by the November 4, 2021 hearing.

Before the Court held the rescheduled evidentiary hearing, Defendant Perttu filed a proposed stipulation and order of dismissal with respect to Plaintiff Kissee.  (ECF No. 103.)  The Court issued the stipulated order of dismissal in part on November 3, 2022.  (ECF No. 105, PageID.736.)

The evidentiary hearing in this case was held on December 19, 2022, and, after

---

[2]     The evidentiary hearing in this case was initially set for November 4, 2021, the same day as the evidentiary hearing in *Richards et al v. Perttu*, W.D. Mich. Case No. 2:20-cv-76.  (ECF No. 50 (Case Management Order).)  However, the evidentiary hearing in *Richards et al v. Perttu*, W.D. Mich. Case No. 2:20-cv-76 took much longer than anticipated, leading the Court to reschedule the hearing in this case for December 29, 2021.  (ECF No. 77 (Notice Rescheduling Hearing).)  The hearing was again rescheduled to January 20, 2022 (ECF No. 77 (Notice Rescheduling Hearing)) but was then adjourned pending the Court's decision on the undersigned's R&R (ECF No. 79 (Notice Cancelling Hearing)).  After the Court approved and adopted that R&R, the hearing was rescheduled for October 18, 2022 (ECF No. 91 (Case Management Order)) but Defendant soon after filed an unopposed motion to adjourn after being placed on medical leave (ECF No. 92 (Unopposed Motion to Adjourn)).  Once Perttu returned to work, the evidentiary hearing was rescheduled for December 19, 2022.  (ECF No. 101 (Case Management Order).)

Plaintiffs expressed their desire to call a prisoner witness who was not present, continued on January 17, 2023.  Prior testimony and MDOC records admitted during the November 4, 2021 evidentiary hearing in *Richards et al v. Perttu*, W.D. Mich. Case No. 2:20-cv-76, showed that the grievance process was available to Richards in administrative segregation and later in general population.  *See Richards v. Perttu*, No. 2:20-cv-76, 2021 WL 8055485, at *9 (W.D. Mich. Dec. 3, 2021), *R&R adopted*, No. 2:20-CV-76, 2022 WL 842654 (W.D. Mich. Mar. 22, 2022).  But Richards and Pruitt argued that Perttu made the grievance process unavailable by threatening them and destroying their grievances.  Plaintiffs called several prisoner witnesses during the November 4, 2021 hearing and the December 19, 2022 hearing, many of whom testified that they saw Perttu threaten and harass Richards and tear up Richards's grievances.  In response to these thwarting claims, at the continued hearing on January 17, 2022, Perttu presented records establishing that some of the prisoner witnesses were even not locked in the same location as Plaintiffs during the time they alleged to have witnessed Perttu's acts of thwarting, and that Perttu did not enter Plaintiffs' housing units on some of the dates of the alleged thwarting.

The undersigned has considered the exhibits, testimony and argument presented during the December 19, 2022 hearing, the January 17, 2023 continuation, and, pursuant to the agreement of the parties, the November 4, 2021 hearing.[3]  The

---

[3]    Notably, the undersigned did not consider testimony or evidence offered at the December 12, 2022 evidentiary hearing in *Richards v. Perttu*, Case No. 2:20-cv-122. Although that case involved both Plaintiff Richards and Defendant Perttu, it did not involve Plaintiff Pruitt.  As such, Pruitt did not have the opportunity to examine any of the witnesses, or object to any of the evidence offered.

undersigned concludes that Defendants have shown, by a preponderance of the evidence, that the grievance process was available to Plaintiffs, and that Plaintiffs nevertheless failed to exhaust their administrative remedies. Accordingly, the undersigned respectfully recommends that the Court dismiss this case.

## II.    Exhaustion of Administrative Remedies

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove.  *Jones v. Bock*, 549 U.S. 199, 212-16 (2007).  The district court may resolve disputed issues relating to exhaustion in a bench trial or evidentiary hearing if a defendant's motion for summary judgment on the issue of exhaustion is denied because "disputed issues of fact regarding exhaustion under the [Prison Litigation Reform Act] present[ ] a matter of judicial administration. . . ." *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015).  Defendants bear "the burden to plead and prove by a preponderance of the evidence" that the prisoner-plaintiff failed to properly exhaust his or her claims.  *Id.* (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)).  "The Sixth Circuit has never adopted a burden-shifting  approach for the defense of PLRA exhaustion." *Lamb v. Kendrick*, 52 F.4th 286, 295 (6th Cir. 2022).

Upon a showing of a prisoner's "affirmative efforts to comply with the administrative procedures" a prisoner's failure to comply with the exhaustion requirement *may* be excused.  *Id.* at 293 (citing *Lee*, 789 F.3d at 677.)  Once a prisoner shows affirmative efforts to comply with administrative procedures, the Court must evaluate "whether 'those efforts to exhaust were sufficient under the circumstances.'" *Id.* (citing *Lee*, 789 F.3d at 677.)  In other words, a prisoner "is not automatically

absolved from the PLRA's exhaustion requirement" by demonstrating that officials interfered with his pursuit of the relevant administrative remedy; the interference must be sufficient to have rendered the remedy unavailable. *Id.* Defendants bear the burden of establishing that the prisoner's efforts were insufficient to excuse the prisoner from the exhaustion requirement. *Id.* at 295.

"Within the context of these evidentiary hearings, federal district or magistrate judges can resolve all genuine issues of material fact related to the exhaustion of administrative remedies." *Alexander v. Calzetta*, No. 2:16-CV-13293, 2018 WL 8345148, at *6 (E.D. Mich. Nov. 30, 2018) (citing *Lee*, 789 F.3d at 677-78), *R&R adopted*, No. 16-CV-13293, 2019 WL 1011106 (E.D. Mich. Mar. 4, 2019).[4] Due to the dispositive nature of the hearing, magistrate judges provide R&Rs regarding their factual findings and recommendations of law.

The undersigned must resolve the issue of whether Plaintiffs failed to properly exhaust their claims against Defendant by a preponderance of the evidence. *Lee*, 789 F.3d at 677. At all times, Defendants bear the burden of showing that Plaintiffs failed to properly exhaust their claim. *Lamb*, 52 F.4th at 295.

---

[4]    A survey of district courts shows that magistrate judges routinely preside over exhaustion evidentiary hearings. *See, e.g., Perry v. Monroe*, No. CIV. 09-239-GPM, 2011 WL 3022229 (S.D. Ill. July 22, 2011); *Alexander v. Salmi*, No. 2:16-CV-96, 2017 WL 3220357 (W.D. Mich. June 27, 2017), *R&R adopted*, No. 2:16-CV-96, 2017 WL 3190643 (W.D. Mich. July 27, 2017); *Ayotte v. Stemen*, No. 15- 13826, 2019 WL 2219739 (E.D. Mich. Feb. 27, 2019); *Alexander v. Calzetta*, No. 2:16- CV-13293, 2018 WL 8345148, at *6 (E.D. Mich. Nov. 30, 2018), *R&R adopted*, No. 16-CV-13293, 2019 WL 1011106 (E.D. Mich. Mar. 4, 2019).

### III.    Plaintiffs' Complaint Allegations

Plaintiffs say that during the morning hours of April 16, 2020, RUM Perttu approached Richards's cell and told Richards that they were going to have a talk, and that Richards ought to cooperate.  (ECF No. 1, PageID.4.)  An hour later, Plaintiffs say that they were both escorted to a phone room.  Perttu was already in the room when Plaintiffs arrived.  (*Id.*)  Plaintiffs allege that Perttu proceeded to beat and sexually assault them for approximately forty minutes.  (*Id.*)

Eight days later, on April 24, 2020, Plaintiffs say that they were escorted to a conference room.  (*Id.*)  Once again, RUM Perttu was in the room when Plaintiffs arrived.  Once again, Plaintiffs allege that Perttu beat and sexually assaulted them. (*Id.*) Plaintiffs say that this pattern repeated on May 20, 2020 and June 1, 2020. According to Plaintiffs, Perttu approached them again on June 29, 2020 and told them to "be ready for next time."  (*Id.*)

### IV.   Analysis

During the evidentiary hearing, RUM Perttu provided testimony regarding the general availability of the grievance process at AMF.  Plaintiffs then presented testimony as to RUM Perttu's attempts to thwart their exhaustion of the grievance process.  Finally, Perttu provided evidence that Plaintiffs were not thwarted from exhausting their claims.

#### a.  General Availability of the Grievance Process and Plaintiffs' Failure to Exhaust

The following witnesses testified as to the general availability of the grievance process at AMF, and of Plaintiffs' failure to exhaust the grievance process:

(1) MDOC Grievance Manager (GM) Richard Russell (testimony on November 4, 2021),

(2) AMF Grievance Coordinator (GC) Thomas Hamel (testimony on November 4, 2021), and

(3) AMF Inspector Craig Cummings (testimony on November 4, 2021).

The following exhibits were offered, and admitted, as evidence of the same:

(1) Defense Exhibit A – MDOC Policy Directive 03.02.130 (Prisoner Grievances) (admitted on November 4, 2021),

(2) Defense Exhibit B – MDOC Policy Directive 03.03.140 (Prison Rape Elimination Act (PREA) and Prohibited Sexual Conduct Involving Prisoners) (admitted on November 4, 2021),

(3) Defense Exhibit C-1 – Richards's Step III Grievance Report and Relevant Grievances (admitted on November 4, 2021),

(4) Defense Exhibit C-2 – Richards's AMF Grievance Summary Report (admitted on November 4, 2021),

(5) Defense Exhibit C-3 – Richards's PREA Grievance Report (admitted on November 4, 2021),

(6) Defense Exhibit D-1 – Pruitt's Step III Grievance Report and Relevant Grievances (admitted on November 4, 2021)

(7) Defense Exhibit D-2 – Pruitt's AMF Grievance Summary Report (admitted on November 4, 2021), and

(8) Defense Exhibit D-3 – Pruitt's PREA Grievance Report (admitted on

9

November 4, 2021).

During the November 4, 2021 evidentiary hearing, GM Russell explained the grievance process set forth in MDOC Policy Directive 03.02.130.  (ECF No. 57-2, PageID.437-440 (Def's Exh. A).)  The process involves three steps: the initial Step I grievance, the Step II grievance appeal, and the Step III grievance appeal.  Russell explained that Step I grievance forms are available in every housing unit in every MDOC facility.  To submit a Step I grievance, prisoners in administrative segregation must ask a staff member to place the grievance form in the mailbox.  Prisoners in general population housing units may place the grievance form in the mailbox themselves.

GC Hamel testified that he is the ultimate recipient of all Step I grievances submitted by AMF prisoners, and that he assigns every grievance an identification code before logging the grievance into a grievance database.  Hamel testified that he has no discretion in processing Step I grievances; he must process every grievance he receives. The only exception is that when a grievance concerns sexual harassment or abuse, GC Hamel forwards the grievance to the PREA Coordinator, Investigator Cummings. Hamel further testified that the Step II and III grievance appeals and responses are also logged into the grievance database, which creates a Prisoner Grievance Summary Report detailing the dates and responses to relevant grievances.

Investigator Cummings testified as to the PREA grievance process.  Cummings walked through the process as outlined in MDOC Policy Directive 03.03.140, which involves two steps: the initial Step I grievance, and the Step II appeal.  (ECF No. 57-3,

PageID.447-449 (Def's Exh. B).)  He explained that a prisoner must obtain a PREA grievance form from the facility staff, and then give the completed form to prison staff in administrative segregation or place the form in the unit mailbox in general population.  Cummings stated that he assigns every PREA grievance an identifier and an investigator, and another staff member then enters the information from the grievance into the AIM database, also known as the Administrative Investigations Management database.

Investigator Cummings also testified that prisoners may lodge PREA complaints against staff verbally or call the PREA hotline number posted in every unit.  But, per MDOC Policy Directive 03.03.140 ¶ EE, only grievances that have been appealed through Step II of the PREA grievance process serve to exhaust a prisoner's claims. (ECF No. 57-3, PageID.447 (Def's Exh. B).)  Taken together, the aforementioned testimony of Russell, Hamel, and Cummings establishes that both the grievance process as set forth in MDOC P.D. 03.02.130 and the PREA grievance process as set forth in MDOC P.D. 03.03.140 were generally available at AMF.

Turning then to Plaintiffs' exhaustion of the available procedures, GM Russell identified Defense Exhibit C-1 as Richards's Step III Grievance Report and D-1 as Pruitt's Step III Grievance Report.  Richards's Report reflects that Richards did not file any grievances between April 16, 2020, the date of the first alleged assault, and July 15, 2020, when Plaintiffs filed this case.  (ECF No. 74, PageID.539-541 (Def's Exh. C-1).)  Pruitt's Report reflects the same.  (ECF No 57-7, PageID.462 (Def's Exh. D-1).)

Investigator Cummings identified Defense Exhibit C-3 as Richards's AIM record,

and Defense Exhibit D-3 as Pruitt's AIM record.  Richards's AIM record, shown below, reflects that Richards's most recent PREA complaint was made in 2017, while Richards was incarcerated at the Alger Correctional Facility.



(ECF No. 57-6, PageID.458 (Def.'s Exh. C-3).)

Pruitt's AIM record, shown below, reflects that Pruitt made PREA complaints while he was incarcerated at Baraga Correctional Facility in February of 2017, and January of 2021, but that he did not make any complaints between April 16, 2020, the date of the first alleged assault, and July 15, 2020, when Plaintiffs filed this case.



(ECF No. 57-9, PageID.471.)

Taken together, Plaintiffs' grievance and AIM records establish that they did not exhaust their claims against RUM Perttu in accordance with MDOC Policy Directive 03.02.130 or MDOC Policy Directive 03.03.140.  But Plaintiffs claim that RUM Perttu prevented their utilization of these processes, rendering them unavailable.

### b.  Allegations of Thwarting

After Defendant Perttu provided evidence of the availability of the grievance and PREA grievance processes at AMF, Plaintiffs called witnesses to testify as to RUM Perttu's efforts to thwart their attempts to exhaust.  Plaintiffs claim that they tried to submit relevant grievances on numerous occasions, but that their grievances were destroyed or rejected.

Plaintiffs called the following witnesses to testify as to Perttu's obstruction of the grievance process:[5]

---

[5]    Although Plaintiffs called additional prisoner witnesses to testify during the

(1) Michael Richard Jackson, Jr. (testimony on November 4, 2021 and December 19, 2022),

(2) Cornelius (testimony on November 4, 2021)[6]

(4) Larry Taylor (testimony on November 4, 2021),[7]

(5) Cleveland Spencer (testimony on November 4, 2021),

(6) Kyle B. Richards (Plaintiff) (testimony on November 4, 2021 and January 17, 2023), and

(7) Kenneth Damon Pruitt (Plaintiff) (testimony on January 17, 2023).

The undersigned did not admit any exhibits from Plaintiffs during the November 4, 2021, December 19, 2022, or January 17, 2023 hearings.  Although Richards attempted to admit witness declarations, the undersigned found that the declarations constituted inadmissible hearsay.

During the November 4, 2021 hearing, Richards asked witness Michael Richard Jackson, Jr. whether, in April of 2020, Jackson "received any mail brought to [his] cell that belonged to prisoner Richards."  Jackson replied that he did.  When Richards asked if the mail included Richards's unprocessed grievances, Jackson replied that it did.

_____

November 4, 2021 hearing, that testimony pertained to alleged observations that occurred before April 16, 2020 — the date of the first alleged instance of sexual assault in Plaintiffs' complaint.  As such, the testimony is not relevant to Plaintiffs' attempts to exhaust their sexual-assault related claims in this case, or Perttu's attempts to prevent Plaintiffs from exhausting those claims.

[6]    Although Cornelius did not testify during the December 19, 2022 hearing or the January 17, 2023 continuation, the undersigned allowed Richards to proffer the testimony that Cornelius would have provided if called.

[7]    Although Taylor did not testify during the December 19, 2022 hearing or the January 17, 2023 continuation, the parties filed a stipulation setting forth testimony that Taylor would have provided if called.  (*See* ECF No. 116 (Stipulation).)

When Richards then asked whether any of those grievances related to sexual harassment, Jackson replied that they did.  Jackson also testified that he let other prison staff know that he had been given Richards's documents, but that the staff did not do anything in response.  When Pruitt asked Jackson what he did with the grievances Perttu gave him, Jackson testified that he gave the grievances back to Richards when he returned to administrative segregation on November 4, 2020. Jackson said that prior to November 4, 2020, he locked in a different unit than Richards, but that when he returned to segregation on that date, he locked next to Richards.

Plaintiffs also called Jackson to testify during the December 19, 2022 hearing. There, Jackson testified that he remembered times in which Richards would hand RUM Perttu his grievances, and Perttu would take them and destroy them.  Jackson also testified that there were times in which Perttu would take Richards's grievances to Jackson and tell Jackson to destroy them.  Jackson testified that he thought these incidents occurred around March of 2020.  Jackson then testified that around May 12, 2020, he witnessed RUM Perttu walk to Richards's cell, take Richards's grievances, and rip the grievances up in front of Richards.  Jackson said that he was across the hall from Richards when this happened.  Jackson also testified during cross-examination that he is serving two sentences for assault with intent to rob while armed.  Jackson said that he is in the process of appealing his convictions.

During the November 4, 2021 hearing, Richards asked witness Michael D. Cornelius whether he recalled observing RUM Perttu destroy Richards's grievances. Cornelius said that he did but could not identify the specific dates of his observations

because he had not written any of them down.  Cornelius stated that it happened three to four times.  Cornelius said that he observed Perttu's acts of thwarting in late 2019 and early 2020, and again after he was moved to Housing Unit Two.  During cross examination, defense counsel asked Cornelius about a declaration he had previously tendered for this case, which set forth specific dates in relation to Cornelius's observations.  Cornelius admitted that he never provided those dates but maintained that the rest of the declaration was accurate.

During the December 19, 2022 hearing, Richards attempted to call Cornelius to testify but, per Marquette Branch Prison Corrections Program Coordinator Bott, Cornelius refused.  The undersigned allowed Plaintiffs to proffer the testimony that Cornelius would have given.  According to Richards, Cornelius would have testified that Richards made multiple verbal complaints to various prison staff regarding staff interference with the grievance process.  Cornelius also would have testified that Perttu sexually harassed Richards.  Pruitt agreed with these statements.

After Cornelius testified on November 4, 2021, Plaintiffs called witness Larry Taylor to testify.  The testimony that Taylor offered during that hearing related to incidents of thwarting occurring prior to April 16, 2020 and is therefore irrelevant.  And Taylor did not testify during the December 19, 2022 hearing or the January 17, 2023 continuation.[8]  However, the parties stipulated that Larry Taylor would have testified

---

[8]    Taylor was not present at the December 19, 2022 hearing because the Court had denied Richards's motion for writ of habeas corpus with respect to Taylor, believing that Taylor's testimony would be outside of the relevant time frame.  (ECF No. 90, PageID.678-679.)  Although Richards did not object to the order denying the writ or otherwise move the Court to reconsider the denial, the undersigned was persuaded by Richards's argument during the December 19, 2022 hearing that Taylor had additional

16

that "on an unknown date between May and June of 2020, [Taylor] saw Perttu take a grievance from Richards and [ball] it up."  (ECF No. 116, PageID.809.)  Taylor also would have testified that during the early afternoon hours of May 1, 2020, Taylor saw Perttu holding multiple grievance forms with Richards's name on them.  (*Id.*, PageID.810.)  Taylor would have then testified that he watched Perttu crumple up the grievances and throw them in the garbage.  (*Id.*)

On November 4, 2021, Richards asked witness Cleveland Spencer whether he recalled RUM Perttu destroying Richards's grievances in late 2019 and early 2020. Spencer responded that he did.  Spencer said that he locked in the same housing unit as Richards at the time.  When Richards asked whether Spencer saw Richards's name on the grievances, Spencer said no.  Instead, Spencer said that he asked Perttu what was going on, and Perttu simply responded by stating "Richards."  Spencer said that he never received any of Richards's grievances.  Spencer did not testify at the December 19, 2022 hearing or the January 17, 2023 continuation.

During the November 4, 2021 hearing, Richards testified that on numerous occasions in late 2019 and early 2020, Perttu destroyed his grievances or otherwise prevented them from being processed.  Richards identified June 15, 2020 as one of the dates that Perttu destroyed his grievances.  The other dates identified by Richards preceded the alleged instances of sexual assault underlying Plaintiffs' claims.  Richards also relied on the dates supplied by his witnesses.  On cross-examination, Richards was

---

relevant testimony to offer.  The undersigned therefore adjourned the hearing and told the parties that they could either stipulate as to Taylor's testimony, or that the undersigned could issue a writ of habeas corpus ad testificandum for Taylor for a later date.  The parties chose to stipulate to the testimony.

asked about the witness declarations that he had provided the Court prior to the hearing.  Richards admitted that he helped draft most of the declarations.  Richards also acknowledged that from April 14, 2020 to July 14, 2020, he was on modified grievance access.  That modified access required him to request Step I grievance forms from GC Hamel.

On January 17, 2023, Richards provided additional testimony.  He stated that from April 2020 to June 2020 he made multiple attempts to submit PREA grievances against Perttu.  Richards said that he never received any response to these complaints.  Richards specifically testified that on May 6, 2020, he attempted to submit a PREA grievance.  Richards says that RUM Perttu took the grievance during rounds, tore the grievance up, and then verbally threatened Richards.  Richards further asserted that Perttu told Richards on numerous occasions that Richards's mail and grievances were "being held in a box up front."  Richards said that on May 10, 2020, he tried to submit another PREA grievance, but RUM Perttu took the grievance and Richards never received a response.  On May 20, 2020, Richards again attempted to submit a PREA grievance and Perttu again took and destroyed the grievance.  And around June 10, 2020, Perttu destroyed another of Richards's PREA grievances.

On cross-examination, Richards again testified that he was on modified access from April 2020 to July 2020.  This time, Richards added that, pursuant to the requirements of modified access, he requested grievance forms from GC Hamel on May 7, May 8, May 9, May 20, and May 21, 2020.  Moments later, Richards testified that he sent Hamel communications on May 4, May 5, May 6, May 20, May 21, May 23, and

May 24, 2020.  Richards then changed his testimony again, asserting that Hamel denied him grievance forms on May 4, May 5, May 6, May 20, May 21, June 3, and June 4, 2020.

Although Pruitt did not elect to testify during the November 4, 2021 hearing, he did testify on January 17, 2023.  There, Pruitt testified that he submitted numerous grievances to RUM Perttu in May and June of 2020 and never received any grievance responses.  He says that he also sent communications to the Deputy Warden and Grievance Coordinator, but that he never received responses.  Pruitt stated that he could only assume that his grievances were destroyed.

For the sake of clarity, the specific instances of thwarting alleged by Plaintiffs and their witnesses during the November 4, 2021 hearing, the December 19, 2022 hearing, and the January 17, 2023 continuation are summarized in the table below:

| Witness | Nature of Allegations | Date(s) |
|---|---|---|
| Michael Richard Jackson, Jr. | Perttu approached Jackson and told him to destroy Richards's grievances.  Jackson also observed Perttu standing in front of Jackson's cell and ripping up Richards's grievances. | April of 2020, approximately May 12, 2020 |
| Michael D. Cornelius | Cornelius watched Perttu destroy some of Richards's grievances. | Late 2019 or early 2020 |
| Larry Taylor | Taylor saw Perttu holding multiple grievance forms with Richards's name on them.  Perttu then crumpled up the grievances and threw them away.  Later, Taylor watched Perttu take a grievance from Richards and crumple it up. | May 1, 2020, an unknown date between May and June of 2022 |
| Cleveland Spencer | Spencer saw Perttu destroy someone's grievances. | Late 2019 or early 2020 |
| Kyle B. Richards (Plaintiff) | Perttu destroyed Richards's grievances. | Numerous occasions in late 2019 and early 2020, May 6, 2020, May 10, 2020, May 20, 2020, June 10, 2020, and June 15, 2020 |

| Witness | Nature of Allegations | Date(s) |
|---------|----------------------|---------|
| Kenneth Damon Pruitt (Plaintiff) | Pruitt submitted relevant grievances to RUM Perttu, but never received responses.  Pruitt wrote to the Deputy Warden and Grievance Coordinator, but never received responses. | May of 2020 and June of 2020 |

### c.  Merit of Thwarting Allegations

After Richards called his witnesses to testify as to the alleged thwarting, RUM Perttu testified.  The Court admitted the following exhibits during Perttu's testimony:

(1) Defense Exhibit F – Prisoner Lock Histories (admitted on January 17, 2023),

(2) Defense Exhibit G – RUM Perttu's Time Sheet (admitted on January 17, 2023), and

(3) Defense Exhibit H – RUM Perttu's Tracker Information (admitted on January 17, 2023).

During the November 4, 2021 hearing, RUM Perttu testified that he has been an MDOC employee for twenty-five years, and a RUM at AMF since 2019.  Perttu said that up until July of 2020, he was the RUM for the administrative segregation housing units, Units One through Three.   In July of 2020, he became the RUM for the general population housing units.

Perttu testified that his shift at AMF runs from 7:00 a.m. to 3:30 p.m.  As a RUM, Perttu is required to conduct rounds in his units.  The MDOC requires him to track his rounds via an electronic wand, which he scans as he passes each individual cell.  Data from the wand is automatically uploaded into a database.  RUM Perttu reported that if prisoners in administrative segregation had mail for him to collect during rounds, he would take it and fold it over, so that no other prisoners could see its contents, and then

separate it in the Prison Counselor's office before placing it in the relevant mailbox.  But Perttu stated that the prisoners' mail is usually collected by their Prison Counselors. And Perttu stated that he does not have access to the housing unit mailboxes, or to the mailroom absent the presence of mailroom staff.

RUM Perttu then explained the way that AMF was constructed.  According to Perttu, all of the administrative segregation housing units are in separate buildings. The individual buildings are shaped like a "V" with A wing and B wing on one side, and C wing and D wing on the other.  Perttu testified that when he did collect mail, he did not carry mail from one unit to another, nor did he mix mail between wings.

During the January 17, 2023 hearing, Perttu discussed Defense Exhibits F, G, and H.  Perttu explained that Defense Exhibit F is the compiled lock histories of Plaintiffs and their prisoner witnesses.  (ECF No. 108-1.)  Exhibit G is Perttu's timesheet for the relevant time period.  (ECF No. 108-2.)  And Exhibit H is the data from Perttu's wand, demonstrating when he scanned the wands at each cell during his rounds, and which housing units he conducted rounds in on a given date.  (ECF No. 108-3.)  Perttu's testimony and exhibits, along with observations that the undersigned made during Plaintiffs' witnesses' testimony, lead the undersigned to conclude that Plaintiffs' witnesses lacked credibility.  The specific observations that lead the undersigned to that conclusion are set forth in detail below.

The undersigned first turns to the prisoners' lock histories (Exhibit F).  The pertinent portions of Exhibit F are shown below:

| 641715 RICHARDS | KYLE | Administrative S BARAGA MAXIMUM | 8/20/2019 | 10/9/2019 03-123B |
| 641715 RICHARDS | KYLE | Administrative S BARAGA MAXIMUM | 10/9/2019 | 5/11/2020 03-229T |
| 641715 RICHARDS | KYLE | General Populati BARAGA MAXIMUM | 5/11/2020 | 1/4/2021 04-239T |
| 641715 RICHARDS | KYLE | Administrative S BARAGA MAXIMUM | 1/4/2021 | 12/2/2021 02-132B |

21

(ECF No. 108-1, PageID.759.)

| 708518 PRUITT | KENNETH | Administrative Se BARAGA MAXIMUM | 10/18/2019 | 10/21/2019 03-103B |
|---|---|---|---|---|
| 708518 PRUITT | KENNETH | Administrative Se BARAGA MAXIMUM | 10/21/2019 | 5/12/2020 03-238T |
| 708518 PRUITT | KENNETH | Administrative Se BARAGA MAXIMUM | 5/12/2020 | 5/12/2020 03-143B |
| 708518 PRUITT | KENNETH | Detention (Punit BARAGA MAXIMUM | 5/12/2020 | 6/4/2020 01-134B |
| 708518 PRUITT | KENNETH | Administrative Se BARAGA MAXIMUM | 6/4/2020 | 6/23/2020 01-115B |
| 708518 PRUITT | KENNETH | Administrative Se BARAGA MAXIMUM | 6/23/2020 | 8/3/2020 01-114B |
| 708518 PRUITT | KENNETH | General Populati BARAGA MAXIMUM | 8/3/2020 | 1/3/2021 04-116B |

(*Id.*, PageID.760.)

| 528987 CORNELIUS | MICHAEL | General Populati BARAGA MAXIMUM | 9/16/2019 | 9/20/2019 04-111B |
|---|---|---|---|---|
| 528987 CORNELIUS | MICHAEL | Administrative Se BARAGA MAXIMUM | 9/20/2019 | 10/3/2019 03-105B |
| 528987 CORNELIUS | MICHAEL | Administrative Se BARAGA MAXIMUM | 10/3/2019 | 3/30/2020 03-138B |
| 528987 CORNELIUS | MICHAEL | General Populati BARAGA MAXIMUM | 3/30/2020 | 11/9/2020 04-231T |
| 528987 CORNELIUS | MICHAEL | Administrative Se BARAGA MAXIMUM | 11/9/2020 | 3/26/2021 03-214T |
| 528987 CORNELIUS | MICHAEL | Administrative Se BARAGA MAXIMUM | 3/26/2021 | 5/27/2021 03-231T |
| 528987 CORNELIUS | MICHAEL | Administrative Se BARAGA MAXIMUM | 5/27/2021 | 8/12/2021 02-137B |
| 528987 CORNELIUS | MICHAEL | OBSERVATION    BARAGA MAXIMUM | 8/12/2021 | 9/9/2021 02-101B |

(*Id.*, PageID.761.)

| 605363 JACKSON | MICHAEL | OBSERVATION    BARAGA MAXIMUM | 8/6/2019 | 8/6/2019 02-101B |
|---|---|---|---|---|
| 605363 JACKSON | MICHAEL | Administrative Se BARAGA MAXIMUM | 8/12/2019 | 4/2/2020 02-206T |
| 605363 JACKSON | MICHAEL | General Populati BARAGA MAXIMUM | 4/2/2020 | 5/13/2020 05-102B |
| 605363 JACKSON | MICHAEL | General Populati BARAGA MAXIMUM | 5/13/2020 | 11/4/2020 05-128B |
| 605363 JACKSON | MICHAEL | Administrative Se BARAGA MAXIMUM | 11/4/2020 | 5/27/2021 03-127B |
| 605363 JACKSON | MICHAEL | Administrative Se BARAGA MAXIMUM | 5/27/2021 | 10/7/2021 02-131B |

(*Id.*, PageID.762.)

| 432739 TAYLOR | LARRY | Administrative Se BARAGA MAXIMUM | 11/18/2019 | 12/12/2019 03-142B |
|---|---|---|---|---|
| 432739 TAYLOR | LARRY | Administrative Se BARAGA MAXIMUM | 12/12/2019 | 5/11/2020 03-207T |
| 432739 TAYLOR | LARRY | General Populati BARAGA MAXIMUM | 5/11/2020 | 1/4/2021 04-229T |
| 432739 TAYLOR | LARRY | Administrative Se BARAGA MAXIMUM | 1/4/2021 | 3/10/2021 03-114B |

(*Id.*, PageID.765.)

With respect to Richards's lock history on its own, the undersigned notes that on May 11, 2020, Richards was moved from Unit Three in administrative segregation to Unit Four, *in general population*. (*Id.*) Perttu testified that at the relevant time, he worked in the administrative segregation housing units, Units One through Three. And Perttu's witnesses testified that while prisoners in administrative segregation must hand their grievances to unit staff for submission, prisoners in general population can place their grievances *directly into the housing unit's mailbox* — a mailbox which is

22

locked, and to which Perttu does not possess a key.[9]  These facts undermine Richards's allegations that Perttu destroyed his grievances on June 15, 2020.  They also undermine Taylor's proffered testimony that on an unknown date between May and June of 2020, Taylor observed Perttu take a grievance from Richards, and ball it up.  If Richards had grievances to file on these dates, as alleged by himself and his witnesses, there was no reason for Richards to submit the grievances to prison staff, let alone a RUM who did not work in his housing unit, when he could have simply placed the grievances in the mailbox himself.

Turning then to Cornelius and Richards's lock histories together, the undersigned notes that between March 30, 2020 and May 11, 2020, Cornelius and Richards locked in different housing units.  Any grievances authored before that time could not have pertained to Plaintiffs remaining claims in this case.  And on May 11, 2020, Cornelius and Richards were reunited in general population, where Richards could have submitted grievances directly to the unit mailbox.  Furthermore, the undersigned notes that despite Cornelius's allegation that he witnessed RUM Perttu thwarting Richards's attempts to file grievances after he was moved to Unit Two in administrative segregation, that move did not occur until May 27, 2021; long after Plaintiffs filed their complaint.

---

[9]    The undersigned recognizes that Richards was on modified grievance access at the time.  But modified grievance access requires prisoners to obtain pre-approved, Step I grievance forms from the grievance coordinator.  (*See* ECF No. 57-2, PageID.441 (Def's Exh. A; MDOC Policy Directive 03.02.130).)   It does not prevent prisoners from submitting their grievance forms to the unit mailbox.  And it is Richards and his witnesses who allege that Richards drafted relevant grievances during this time, which Perttu then destroyed.

Turning finally to Jackson and Richards's lock histories, the undersigned notes that Jackson and Richards did not lock in the same housing units during the relevant time period.  This means that Jackson could not have observed Perttu ripping up grievances in front of Richards's cell in May of 2020.  What's more, it means that Jackson could not have returned Richards's grievances to Richards when Jackson returned to administrative segregation in November of 2020; in November of 2020, Richards locked in general population.  In fact, Richards and Jackson did not lock in the same unit until May 27, 2021.  It is reasonable to conclude that if Jackson had returned Richards's grievances at that time, Richards would have retained them for this case, which was already pending.

Ultimately, the fact that the lock histories disprove many of the witnesses' allegations casts doubt on the credibility of these witnesses, and therefore calls into question the reliability of all of their testimony.  But the lock histories are not the only records that cast such doubt.  The data from Perttu's wand reflects that despite Jackson's allegation that Perttu asked him to destroy grievances on May 20, 2020, Perttu did not enter Richards or Jackson's housing units.  (ECF No. 108-3, PageID.785-786.)  And despite Richards's allegations that his grievances were destroyed on June 10, 2020 and June 15, 2020, Perttu did not enter Richards's housing unit on those dates.  (*Id.*, PageID.791, 794.)  Furthermore, Perttu's timesheet reflects that despite Richards's allegation that Perttu took a grievance from him on May 10, 2020, Perttu did not work that day. (ECF No. 108-2, PageID.767.)

But even setting Exhibits F, G, and H aside, the testimony of Richards's witnesses

24

bore indicia of unreliability.  During Richards's direct examination of several of his witnesses on November 4, 2021, Richards's relied on yes or no questions in which he provided the date and details of Perttu's alleged destruction of grievances, and the witnesses simply agreed.  For example, Richards asked Jackson whether, in April of 2020, Jackson "received any mail brought to [his] cell that belonged to prisoner Richards."  This form of questioning did not provide Plaintiffs' witnesses the opportunity to develop their testimony independently or demonstrate personal knowledge of the incidents.  And when Richards began asking open-ended questions, the witnesses were unable to provide specific or even approximate dates of thwarting.  Indeed, Cornelius admitted during the November 4, 2021 hearing that he could not recall the dates on which he observed Defendant Perttu destroying Richards's grievances, and that the dates in an earlier declaration were supplied by Richards.  Richards then admitted that he assisted in authoring the majority of his prisoner-witnesses' declarations.

It is also worth noting after all of this discussion with respect to Richards and his attempts to exhaust the grievance process that very little testimony was offered with respect to Pruitt's attempts to exhaust.  Though Plaintiffs contend that Perttu prevented them both from utilizing the grievance process, Pruitt was the only witness to testify on Pruitt's behalf.  And Pruitt merely stated that he submitted grievances and kites and did not receive responses, so he could only assume that Perttu was discarding the grievances or otherwise obstructing Pruitt's use of the process.  From October 9, 2019 to May 11, 2020, Pruitt locked in cell 238T of Unit Three and Richards locked in cell 229T of Unit Three.  The fact that several witnesses testified to watching Perttu

harass Richards and destroy Richards's grievances, but not one witness testified as to watching Perttu harass Pruitt or destroy Pruitt's grievances further undermines the credibility of the witnesses.

Ultimately, taking all of the evidence together, the undersigned is satisfied that RUM Perttu has met his burden of proving by a preponderance of the evidence that Plaintiffs failed to properly exhaust their remaining claims. The allegations of Plaintiffs and their witnesses are simply too far-fetched and too thoroughly contradicted by prison records for the undersigned to find otherwise.

## V.    Conclusion and Recommendation

The undersigned concludes that Defendants have shown, by a preponderance of the evidence, that the grievance process was available to Plaintiffs, and that Plaintiffs were not thwarted from filing grievances against RUM Perttu. Nevertheless, Plaintiffs failed to exhaust their administrative remedies. Accordingly, the undersigned respectfully recommends that the Court dismiss this case.[10]

Date:    January 27, 2023                          /s/ *Maarten Vermaat*
                                                    MAARTEN VERMAAT
                                                    U. S. MAGISTRATE JUDGE

---

[10]    The undersigned notes that this R&R does not eliminate or otherwise alter the deadlines set forth in this Court's order dated January 17, 2023 (ECF No 119), or this Court's amended case management order dated January 19, 2023 (ECF No. 120).

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).